Filed 7/10/13  Valley Casework v. Lexington Ins. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VALLEY CASEWORK, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> LEXINGTON INSURANCE COMPANY, <br><br> Defendant and Respondent. | D060837 <br><br><br> (Super. Ct. No. 37-2010-00101021-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego, Timothy Taylor, Judge.  Reversed and remanded with directions.

Yale & Baumgarten, David W. Baumgarten and Eugene P. Yale for Plaintiff and Appellant.

Gordon & Rees, Peter Schwartz and Christopher R. Wagner for Defendant and Respondent.

Plaintiff and appellant Valley Casework, Inc. (Valley), a cabinet maker and installer, appeals from a summary judgment in favor of defendant and respondent Lexington Insurance Company (Lexington) on Valley's second amended complaint for breach of contract and breach of the implied covenant of good faith and fair dealing. Valley alleged Lexington owed a duty to defend it against a claim of liability arising out of Valley's installation of cabinets, after one cabinet fell from the wall and broke a faucet causing water damage to a home in August 2008. Lexington had denied coverage under a commercial general liability (CGL) insurance policy issued for the period February 20, 2007, to February 20, 2008. Valley contends Lexington cannot meet its burden of proving there is no conceivable theory raised by the underlying lawsuit bringing it within the operative provisions of the Lexington's CGL policy. Valley also contends there is a triable issue of material fact as to whether a continuous loss endorsement in the policy deems the alleged property damage to have occurred during the policy period.

We reverse the summary judgment on Valley's breach of contract cause of action because Valley raised triable issues of material fact via the declaration of its founder Ronald Raymond, which was erroneously excluded in its entirety by the trial court. However we conclude Lexington is entitled to summary adjudication of Valley's claims for breach of the covenant of good faith and fair dealing and punitive damages. We remand with directions that the trial court enter a new order accordingly.

FACTUAL AND PROCEDURAL BACKGROUND

*The CGL Policy*

Lexington issued a CGL policy to Valley effective February 20, 2007, to February 20, 2008 (the policy).[1] The policy's insuring agreement provides in part: "We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages . . . . [¶] . . . [¶] . . . This insurance applies to . . . 'property damage' only if: [¶] (1) The . . . 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and [¶] (2) The . . . 'property damage' occurs during the policy period." As pertinent here, the policy defines "property

---

[1] The CGL policy, which indicates on its face that it is a renewal of another policy, is the only Lexington policy in the summary judgment record. According to Valley, it is a renewal of policies first issued by Lexington on February 20, 2003, and renewed on an annual basis until February 20, 2008, when Lexington elected to not renew the policy. For this fact, Valley cites only its complaint's allegations; it did not submit in its opposition evidence of the policies showing their effective dates, nor did it include those facts in its opposing separate statement of material facts. To rebut a moving party's showing on summary judgment, the opponent may not rely on allegations in the pleadings, even if verified, but must instead "set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(1); *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1290; see *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 720, fn. 7.) We asked the parties to brief various questions concerning Valley's proof of coverage periods, and conclude that because Lexington did not raise any issue below about the factual question of the dates of effective coverage, it forfeited the point on appeal. (See *Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 907 [new factual theories of defense may not be raised for the first time on appeal].)

3

damage" to mean "[p]hysical injury to tangible property, including all resulting loss of use of that property."

The policy contains a "Continuous or Progressive Loss Endorsement" (the continuous loss endorsement). It provides: " 'Occurrence' means an accident including continuous or repeated exposure to substantially the same general harmful conditions. [¶] In the event of continuing or progressive . . . 'property damage' over any length of time, such . . . 'property damage' shall be deemed to be one 'occurrence[,'] and shall be deemed to occur only when such . . . 'property damage' first commenced." The endorsement further provides: "In the event of continuing or progressive . . . 'property damage' over any length of time, we will have no duty to defend or investigate any 'occurrence', claim or 'suit' unless such . . . 'property damage' first commenced during the policy period."

*Events Giving Rise to This Litigation*

Valley was hired to install cabinets in a newly constructed home in Carlsbad (the property), which was eventually purchased by Danny Lampel in 2006. Lampel was the first homeowner to occupy the property.

In August 2008, Lampel returned from a two-day trip and discovered her home was flooded. She inspected the property and found that a cabinet in the utility room had fallen off the wall and struck a faucet, causing a release of water seriously damaging the property. Lampel's homeowner's insurer, California Capital Insurance (CCI), paid for repairs.

In May 2009, CCI filed an action against Valley and others demanding it be reimbursed for $50,848.37 in damages. In the Judicial Council form complaint, CCI

4

alleged that on or about August 4, 2008, it was injured by a certain cabinet that the defendants had designed, manufactured, sold and installed. It further alleged: "Defendants owed a duty to erect a personal residence for the benefit of plaintiff's insured, Danny Lampel, in a fit and workmanlike manner, including the installation of a certain cabinet in that new residence in a fashion which would insure [*sic*] that the cabinet would not fall off a wall in the residence by its own weight; defendants breached that duty when they installed the cabinet by merely screwing the cabinet into the drywall and without fasteners of any sort which would be sufficient to hold the cabinet up, so as to allow the cabinet to fail and fall upon a faucet located immediately beneath the falling cabinet, thereby resulting in a breakage of the faucet and the release of water throughout the residence. Having paid to repair that water loss to the residence under the written homeowners policy which the plaintiff issued to Danny Lampel, the plaintiff acquired rights of subrogation to hold the defendants accountable and to secure reimbursement from the defendants for those repair costs . . . ." (Some capitalization omitted.)

In July 2009, Valley's insurance broker submitted a loss notice to third party claims administrator York Claims Service, Inc. (York), identifying August 4, 2008, as the "time of [the] accident" and the damage as "water released throughout the residence[.]" (Capitalization omitted.) Thereafter, York advised Valley's founder, Ronald Raymond, that a question of coverage had arisen on preliminary review and it would conduct an investigation under a reservation of its rights.

In October 2009, York on Lexington's behalf informed Raymond it had denied coverage on grounds the CCI action did not allege property damage during the relevant

5

policy period. In part, the letter advised Valley of the definitions of "property damage" and "occurrence," stating that the latter "means an accident including continuous or repeated exposure to substantially the same harmful conditions." The letter also states: "The [CCI complaint's] allegations do include a claim for damages that includes 'property damage' that was caused by an 'occurrence' as those terms are defined by the policy. However, the alleged damages occurred on August 4, 2008, which was outside of the Lexington policy period, which ended on February 20, 2008. Accordingly, there is no coverage for this lawsuit under the Lexington policy." The letter continues: "If you have any additional information which you feel would either cause us to change our position or would assist us in our investigation or determination, we ask that you advise us as soon as possible."

*The Present Lawsuit*

Valley sued Lexington for breach of contract and breach of the implied covenant of good faith and fair dealing. Valley voluntarily amended its complaint in the face of Lexington's demurrer, and eventually filed a second amended complaint in which Valley alleged for the first time that, prior to expiration of its policy on February 20, 2008, the cabinet causing the flooding had started pulling away from the subject wall, damaging paint and drywall. Valley alleged on information and belief that "such damage continuously progressed to the point where the mechanical fastening system failed, causing the cabinet to pull completely away from the wall and crash into the faucet below, resulting in the additional damage claimed in the CCI suit. [Valley] contends that under the amended definition of 'occurrence' contained in [the continuous loss

6

endorsement], all of the damage—from the preliminary damage to the paint and drywall through the damage to the faucet and the resulting flood—is 'deemed to be one occurrence' and is 'deemed to [have] occur[ed]' when the cabinet first started pulling away from the wall during the Lexington policy period."

Lexington moved for summary judgment or alternatively summary adjudication. It argued Valley could not maintain its breach of contract cause of action because (1) coverage was not triggered under the policy and (2) the continuous loss endorsement was irrelevant because there was no evidence—but only speculation—that property damage "first commenced" during the policy period. It submitted Lampel's declaration, in which Lampel, who had a background in new construction real property sales, averred she never saw the cabinet in the utility room pulling away from the wall before the damage occurred on August 4, 2008, nor did she observe any evidence (paint chips, drywall dust) indicating damage relating to the installation of the cabinets above the faucet. Lampel stated: "The first time I observed any damage to the Property relating to the cabinet installed above the faucet in the utility room was when I discovered the flood on or about August 4, 2008." As for Valley's bad faith cause of action, Lexington argued it failed absent coverage under the policy, it was precluded by the "genuine dispute" doctrine, and the evidence showed Lexington had conducted an appropriate investigation. Finally, Lexington sought summary adjudication of Valley's punitive damages claim, asserting there was no evidence to support it.

Valley opposed the motion. It argued given the allegations in its second amended complaint and Lexington's broad duty to defend, Lexington could not meet its threshold

7

burden of proving that the CCI action " 'can by no conceivable theory raise a single issue which would bring it within the policy coverage[.]' "  It further argued there was a triable issue of material fact as to whether the property damage first commenced during the policy period; that Lexington was required to look beyond the complaint's allegations regarding when the cabinet fell off the wall, and had it conducted an adequate investigation, it would have discovered that an improperly installed cabinet begins to fail as soon as it is put under a load, damaging paint and drywall as it pulls away from the wall.  According to Valley, under the continuous loss endorsement, "all of the property damage—from the preliminary damage to the paint and drywall through the damage to the faucet and the resulting flood"—was deemed to be one occurrence and was deemed to have occurred when it first commenced, i.e., when the cabinet started to "creep" shortly after it was installed, approximately two years before expiration of the policy period on February 20, 2008.  Valley also argued triable issues existed as to whether Lexington denied coverage in bad faith and acted fraudulently for purposes of recovering punitive damages.

Valley submitted the declarations of Raymond, who started Valley in 1982, and also architect and general contractor expert Norbert Lohse.  Raymond averred that homeowners with a falling cabinet would not notice damage occurring to the drywall, paint, or caulking on the top of the cabinet because the top of upper cabinets is not readily visible.  He stated:  "In all of the 'falling' cabinet claims I have investigated during my 49 year career, the weight of the lower shelves would result in the cabinet pulling away from the top of the cabinet until eventually it would reach a point of no return and fall from the

8

wall, with the top falling first and the bottom following. As soon as the cabinet starts moving, immediately after being put to use, the bottom of the cabinet would begin to damage the drywall by indenting it (the wood cabinet is harder than the soft drywall), and the top of the cabinet would begin to separate, damaging the paint and the caulking across the top of the cabinet." Raymond stated that based on his experience, the cabinet at issue would have started to cause damage to drywall, paint and caulking immediately after being put to use by the homeowner in 2006. Lohse reached the same conclusions, stating that Lampel's cabinet exhibited a "classic situation commonly referred to as 'continuous creep.' " He averred that paint chipping and drywall dust were not necessarily manifestations of damage to paint, caulking and drywall in continuous creep cabinet cases, nor were they determinative of when the damage commenced.

In reply, Lexington objected to the Raymond and Lohse declarations on numerous grounds, including that their opinions lacked foundation, and were irrelevant and improper. In part, it argued that the point of the continuous loss endorsement was to trigger only one policy for a given loss, and the pertinent inquiry was whether the CCI action involved a claim for property damage during the policy period. According to Lexington, Valley could not make that showing because the CCI action alleged the "property damage" occurred on August 4, 2008, which was consistent with Lampel's statement that there was no indication of damage to the utility room before that date. Lexington further argued the property damage testified to by Raymond and Lohse was so negligible and immaterial that it did not fall within the policy's definition of property damage.

9

Sustaining Lexington's objections to the Raymond and Lohse declarations, the trial court tentatively granted Lexington's motion. In part, it ruled based on both the CCI action's allegations and extrinsic evidence, Lexington met its burden to demonstrate Valley could not establish the CCI action involved a claim for property damage that occurred during the policy period.[2] It further ruled that any property damage suggested by Raymond and Lohse, assuming admissibility of their opinions and findings, was "imperceptible" and did not qualify as "property damage" within the meaning of the policy. Following oral argument, the court confirmed its ruling and entered judgment in Lexington's favor. Valley timely appeals.

DISCUSSION

I. *Summary Judgment Standard of Review*

---

[2] As to extrinsic evidence giving rise to a duty to defend, the court reasoned: "When [Valley's second amended complaint] claimed for the first time that there was unreported damage to paint and drywall at the Property [six] months before the water incident, Lexington contacted the property owner Ms. Lampel. Her declaration avers she saw nothing to suggest 'cabinet creep.' She was the only person in a position to observe 'property damage' before 8/4/08, yet she saw no such thing. The claim against [Valley] did not involve a claim for 'property damage' during the Policy period. The opposing declarations from [Valley], by Mr. Raymond and Mr. Lohse, lack foundation, as neither has any personal knowledge of what took place at the home. Additionally, their declarations speculate as to what may have occurred at the premises." Lexington asserts in its respondent's brief on appeal that "as soon as [Valley] speculated about 'continuous creep,' Lexington immediately interviewed the owner of the Property at the time of the loss, Danny Lampel." But Lexington does not provide a record cite for this fact, and it is not included in Lexington's separate statement. The Lexington claims management analyst who approved the coverage denial, Thomas Del Monte, does not indicate in his supporting summary judgment declaration that he or anyone on Lexington's behalf interviewed Lampel before denying coverage, and because we strictly construe Lexington's evidence, we can only infer that Lexington contacted Lampel for the first time when it obtained her June 2011 declaration for purposes of its summary judgment motion.

10

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant who moves for summary judgment or summary adjudication bears the initial burden to show that the cause of action has no merit—that is, "that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subds. (a), (p)(2).)

If the defendant carries that burden, "the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) A triable issue of material fact exists " 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.] Thus, a party 'cannot avoid summary [adjudication] by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact.' " (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1144-1145.)

On review of a summary judgment, we take the facts from the record before the trial court when it ruled on the motion. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) " ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of

11

the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party."  (*Ibid*.)

## II.  *Insurer's Duty to Defend*

An insurer's duty to defend its insured is very broad.  "[T]he insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy."  (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 299 (*Montrose I*).)  " '[O]nce the insured has established potential liability by reference to the factual allegations of the complaint, the terms of the policy, and any extrinsic evidence upon which the insured intends to rely, the insurer must assume its duty to defend unless and until it can *conclusively* refute that potential.' " (*Ibid*., italics added.)  To protect an insured's right to call on the insurer's "superior resources for the defense of third party claims . . . California courts have been consistently solicitous of insureds' expectations on this score."  (*Id.* at pp. 295-296.)  Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor.  (*Id.* at pp. 299-300.)

Accordingly, "[t]he insurer must defend any claim that would be covered if it were true, even if it is 'groundless, false or fraudulent.'  [Citation.]  'Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded.  [Citations.]'  [Citation.]  'Thus, when a suit against an insured alleges a claim that potentially could subject the insured to liability for covered damages, an insurer must

12

defend unless and until the insurer can demonstrate, by reference to undisputed facts, that *the claim cannot be covered.* In order to establish a duty to defend, an insured need only establish the existence of a potential for coverage; while to avoid the duty, the insurer must establish the absence of any such potential.' " (*Palp, Inc. v. Williamsburg National Ins. Co.* (2011) 200 Cal.App.4th 282, 288-289 (*Palp*); *Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1188 [plaintiff bears the burden to establish that the occurrence "forming the basis of its claim is within the basic scope of insurance coverage"].)

" '[W]hether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy' [citation] and extrinsic facts '*known by the insurer* at the *inception* of the third party lawsuit . . . .' " (*Palp*, *supra*, 200 Cal.App.4th at p. 289.) The duty disappears "where the facts are undisputed and conclusively eliminate the potential the policy provides coverage for the third party's claim." (*Ibid.*) Stated another way, " ' "[t]he insurer need not defend if the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*" ' " (*Advanced Network, Inc. v. Peerless Ins. Co.* (2010) 190 Cal.App.4th 1054, 1061.)

However, the assessment of potential coverage is not limited to the complaint's allegations or extrinsic facts known to the insurer. The California Supreme Court has emphasized: "To protect its insured's contractual interest in security and peace of mind, 'it is essential that an insurer fully inquire into possible bases that might support the insured's claim' before denying it." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 721; *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819.) " 'A trier of

13

fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim.' " (*Wilson*, at p. 721.) Thus, an insurer must undertake a thorough, fair and reasonable investigation into the circumstances of the claim before denying coverage. (Ins. Code, § 790.03, subd. (h)(3); *Wilson*, at pp. 720, 723; *Aerojet-General Corp. v. Transport Indemn. Co.* (1997) 17 Cal.4th 38, 58; *Egan*, at p. 819; *American Internat. Bank v. Fidelity & Deposit Co.* (1996) 49 Cal.App.4th 1558, 1571.)

### III. *Trigger of Coverage*[3]

Where a summary judgment involves " 'a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts.' " (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390.) Ordinary rules of contract interpretation apply. (*Ibid*.; *County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 415.)

---

[3]    " 'A key inquiry under an occurrence-based policy is what fact or event triggers an insurer's duty to defend and/or indemnify its insured.' " (*St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Mut Ins. Co.* (2012) 210 Cal.App.4th 645, 660.) "In the *third party* liability insurance context, 'trigger of coverage' has been used by insureds and insurers alike to denote the circumstances that activate the insurer's defense and indemnity obligations under the policy." (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 655, fn. 2 (*Montrose II*).) The term is not a doctrine to be automatically invoked by a court to conclusively establish coverage, but instead "is a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the *potential* of coverage to arise. The issue is largely one of timing—what must take place *within the policy's effective dates* for the potential of coverage to be 'triggered'?" (*Ibid*.) " '[I]f the policy expressly provides when coverage is "triggered," such language will be determinative.' " (*Westoil Terminals Co., Inc. v. Industrial Indemnity Co.* (2003) 110 Cal.App.4th 139, 148.)

14

" 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation." ' " (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647-648; see also *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 194-195.)

An insurance policy's coverage provisions must be interpreted broadly to afford the insured the greatest possible protection. (*MacKinnon*, *supra*, 31 Cal.4th at p. 648.) To prevail, the insurer must establish its interpretation of the policy is the *only* reasonable one. (*Id.* at p. 655.) Even in the face of an insurer's reasonable interpretation, the court must interpret the policy in the insured's favor if any other reasonable interpretation permits recovery on the insured's behalf. (*Ibid.*, citing *State Farm Mut. Auto. Ins. Co. v. Jacober* (1973) 10 Cal.3d 193, 202-203.)

In this case, the Lexington policy provides that property damage must be caused by an occurrence, and the property damage must "occur[] during the policy period." The insuring clause of Lexington's policy makes it "occurrence-based," which ordinarily means that the policy covers property damage that occurred during the policy period. (*St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Mut Ins. Co.*, *supra*, 210

15

Cal.App.4th at p. 660, citing *Montrose II*, *supra*, 10 Cal.4th at p. 668.) That conclusion does not resolve the coverage question, because it is necessary to decide whether the continuous loss endorsement affects activation of Lexington's defense duty. (See *Montrose II*, at p. 677 [when deciding which trigger of coverage applies, the "precise question . . . is what result follows *under the language of the policies of insurance to which the parties agreed, including the standardized definitions that were incorporated into those policies*"]; accord, *Pennsylvania General Ins. Co. v. American Safety Indemnity Co.* (2010) 185 Cal.App.4th 1515 (*Pennsylvania General*).)

Lexington's continuous loss endorsement added language to the definition of occurrence "in the event" of *continuing or progressive* property damage over any length of time. Furthermore, where property damage is continuing or progressive it is deemed to be "one 'occurrence' " and "shall be deemed to occur only when such . . . 'property damage' first commenced." Lexington's obligation to defend or investigate is eliminated "unless such . . . 'property damage' first commenced during the policy period." This additional language, as Lexington points out, is intended to circumvent the "continuous injury trigger" established in *Montrose II*, allowing multiple policies to be triggered for the same loss. (*Montrose II*, *supra*, 10 Cal.4th at p. 689 ["Where . . . successive CGL policy periods are implicated, bodily injury and property damage which is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods"]; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶¶ 7:175, p. 7A-88, 7:177.10, p. 7A-92, 7:1437.5, p. 7E-30.1.)

16

The Lexington CGL policy is akin to the CGL policy interpreted in *Pennsylvania General*, *supra*, 185 Cal.App.4th 1515, which had an insuring clause similar to Lexington's policy at issue here,[4] and also, like here, contained an endorsement refining the definition of occurrence to focus on the commencement of property damage: " ' "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions *that happens during the term of this insurance.  "Property damage" . . . which commenced prior to the effective date of this insurance will be deemed to have happened prior to, and not during, the term of this insurance*.' "  (*Pennsylvania General*, *supra*, 185 Cal.App.4th at p. 1525.)  This court observed the language employed was designed to circumvent the continuous injury trigger of the coverage rule laid down in *Montrose II*, and that construction "means the appropriate focus for an occurrence is on *when the damages caused by the negligent causal acts of the insured first commenced*, and is *not* on when the insured completed its work."  (*Pennsylvania General*, at p. 1532.)  That CGL policy's amended definition of occurrence was held in *Pennsylvania General* to be reasonably susceptible to the interpretation that "resulting damage, not the [negligent act of the insured], is still a

---

[4]    The insuring clause at issue in *Pennsylvania General* provided it would indemnify its insured for any amount the insured became obligated to pay as " ' "property damage" to which this insurance applies,' and specified that '[t]his insurance applies to . . . "property damage" only if:  [¶]  (1)  The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and  [¶]  (2)  The . . . "property damage" occurs during the policy period.' "  (*Pennsylvania General*, *supra*, 185 Cal.App.4th at pp. 1524-1525.)

17

defining characteristic of the occurrence that must take place during the policy period to create coverage."  (*Id.* at p. 1526.)

In this case, the continuous loss endorsement's amended definition of "occurrence" is implicated in the event of continuing or progressive property damage, and here, like in *Pennsylvania General*, the "appropriate focus for an occurrence is on *when the damages caused by the negligent causal acts of [Valley] first commenced . . . .*"  (*Pennsylvania General*, *supra*, 185 Cal.App.4th at p. 1532.)  It is not enough, as Valley seems to suggest, that some of the property damage take place "at *any time prior* to the expiration of the policy . . . ."  (Italics added.)  Lexington's coverage obligation is eliminated even where property damage occurs before the end of the policy period, if it does not first commence within the policy's effective dates.

## IV.  *Breach of Contract Cause of Action*

### A.  *Lexington's Threshold Summary Judgment Burden*

With the above principles in mind, we assess whether Lexington met its initial summary judgment "burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact."  (*Aguilar*, *supra*, 25 Cal.4th at pp. 850-851; see also *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766, 776-777.)  Valley appears to address Lexington's initial burden by contending, as it did below, that "Lexington cannot carry its burden of proving that the CCI suit 'can by no conceivable theory raise a single issue which would bring it within the Policy coverage.' "  Valley then argues that summary judgment should be denied because, "Under the operative provisions of the Policy, there is at least a triable

issue of material fact as to whether the alleged property damage is 'deemed' to have 'first commenced' within the Policy period."  Valley additionally argues that Lampel's declaration does not establish the absence of a triable issue of material fact because her assertion that she did not notice any paint chips or drywall dust does not negate other damage to caulking or drywall.  It maintains her statement is not determinative of coverage because the policy is not a claims-made or "manifestation" policy,[5] but only requires property damage, no matter how slight, to commence during the policy period.

Lexington's threshold summary judgment burden is heavy, since, as discussed above, it must defend Valley as long as it ascertains facts that *raise the possibility* that the insured will be liable for losses covered by the policy.  (*Montrose I*, *supra*, 6 Cal.4th at p. 295; *Grey v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 276-277.)  It is Valley's underlying burden at trial to show the complaint's allegations, extrinsic facts known to Lexington, or facts that were available to Lexington had it conducted a reasonable inquiry into possible bases that would support Valley's claims, gave rise to potential coverage in that property

---

[5]     This court has explained that a " 'claims-made' policy[] ' "is one whereby the carrier agrees to assume liability for any errors, including those made prior to the inception of the policy as long as a claim is made during the policy period." ' "  (*Davis v. Farmers Ins. Group* (2005) 134 Cal.App.4th 100, 106.)  By a "manifestation" policy, Valley presumably refers to a first party insurance policy (as distinguished from a CGL third party liability policy as here) having a "manifestation of loss" rule, under which "the insurer insuring the property at the time appreciable property damage first becomes manifest [is] solely responsible for indemnification to the insured."  (*Montrose II*, *supra*, 10 Cal.4th at p. 674; *Prudential-LMI Com. Ins. v. Superior Court* (1990) 51 Cal.3d 674, 699; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 6:232, p. 6B-17.)  "[T]hird party CGL policies do not impose, as a condition of coverage, a requirement that the damage or injury be discovered at any particular point in time."  (*Montrose II*, at p. 664.)

damage—defined as physical injury to tangible property—first commenced during the policy period. (See *Aydin Corp. v. First State Ins. Co.*, *supra*, 18 Cal.4th at p. 1188.) Lexington must demonstrate Valley cannot meet its burden by presenting evidence sufficient to show "that the underlying claim cannot come within the policy coverage by virtue of the scope of the insuring clause" (*Montrose I*, *supra*, 6 Cal.4th at p. 301), and it is therefore entitled to summary judgment as a matter of law. (Code Civ. Proc., § 437c, subds.(c) & (f)(2); see also *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.*, *supra*, 187 Cal.App.4th at p. 778 [summary judgment affirmed in insurer's State Farm's favor on ground State Farm demonstrated insured could not meet its threshold burden of showing a claimed loss fell within the policy's insuring clause]; *Monticello Ins. Co. v. Essex Ins. Co.* (2008) 162 Cal.App.4th 1376, 1385.)

We conclude Lexington met its threshold summary judgment burden. Looking first to the underlying complaint's allegations, the CCI action alleges CCI suffered injury on August 4, 2008, and describes its right to subrogation as arising after it had paid to repair "water loss to the residence" occurring due to the falling cabinet; it sought reimbursement "for those repair costs . . . ." Reasonably construed, the CCI action on its face does not recite facts suggesting that the defectively installed cabinet had caused any sort of gradual, progressive or continuing damage to Lampel's home preceding its fall and the resulting broken faucet. There are no "fairly inferable" facts (*Montrose II*, *supra*, 10 Cal.4th at p. 655) indicating a potential that property damage first commenced during the policy period, which ended approximately six months before the cabinet failed and caused the ensuing flood damage in August 2008.

20

Nor does the record show or suggest that there was extrinsic evidence known to Lexington at the time of Valley's tender that should have put Lexington on notice of potential coverage. All indications at the time of tender were that the property damage was caused by a sudden event: the flood caused by the falling cabinet, which resulted in immediate damage to Lampel's home; those are not the sort of circumstances from which Lexington should have suspected a defectively installed cabinet would cause gradual, progressive or continual property damage months or years before falling from the wall.

Valley suggests Lexington's own evidence shows it did not conduct an adequate investigation of coverage by reasonably available sources extrinsic to the CCI complaint, including presumably by consulting with Raymond or other experts. It points out that in denying coverage, Lexington did not reference the amended definition of "occurrence" in the continuous loss endorsement, and that Lexington as a result did nothing to determine whether property damage "first commenced" at some point before the policy's expiration on February 20, 2008. We note that Lexington in its letter denying coverage invited input from Raymond on the coverage question without any response. Under the circumstances, Lexington reasonably concluded that no progressive or continuing property damage was implicated by the sudden event of a defectively installed cabinet falling from the wall, and that the amended definition of "occurrence" was not at issue. Accordingly, we cannot say Lexington unreasonably ignored the policy language in denying coverage.

In any event, where an insurer "has made an informed decision on the basis of the third party complaint and the extrinsic facts *known* to it at the time of tender that there is

21

no potential for coverage, the insurer may refuse to defend the lawsuit. . . . [¶] An insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date. . . . Thus, the issues here are what facts [the insurer] knew at the time [the insureds] tendered the defense of the [third party] lawsuit, both from the allegations on the face of the third party complaint, and from extrinsic information available to it at the time; and whether these *known facts* created a potential for coverage under the terms of the Policy." (*Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1114; see also *Shanahan v. State Farm General Ins. Co.* (2011) 193 Cal.App.4th 780, 786 [insurer has no duty to defend where under the facts of the complaint or known extrinsic facts, the potential for liability is " ' "tenuous and farfetched" ' "]; *Griffin Dewatering Corporation v. Northern Insurance Company of New York* (2009) 176 Cal.App.4th 172, 197-198 [facts from which potential for coverage is gauged are those from the inception of the lawsuit, and such facts "do not include speculative facts *not in the complaint* or otherwise unknown by the insurance company"].)

Once Lexington reasonably determined there was no potential for coverage by reference to the policy, the CCI complaint, and facts known to it, it had no "continuing duty to investigate whether there is a potential for coverage." (*Gunderson v. Fire Ins. Exchange*, *supra*, 37 Cal.App.4th at p. 1114.) In sum, the facts presented by Lexington in its moving papers were sufficient to meet its prima facie summary judgment burden.

B. *Valley's Opposing Summary Judgment Burden*

In opposition to Lexington's motion, Valley had a burden of production of its own to make a prima facie showing of the existence of a triable issue of material fact. (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) A triable issue of material fact exists " 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.] Thus, a party 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact.' " (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.*, *supra*, 199 Cal.App.4th at pp. 1144-1145; see *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.*, *supra*, 187 Cal.App.4th at p. 777 [opposition to summary judgment will be deemed insufficient when it is essentially conclusionary, argumentative, or based on conjecture and speculation].) " 'If coverage depends on an unresolved dispute over a factual question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend.' " (*Howard v. American Nat. Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 520.)

Here, Valley sought to meet its burden by proffering Raymond's and Lohse's opinions, but the trial court excluded their declarations almost in their entirety on foundation, speculation and relevance grounds, as well as on grounds they constituted "improper opinion." In reviewing the propriety of summary judgment, we consider "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We review for abuse of

23

discretion the trial court's decision to exclude the experts' testimony. (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679; *Shugart v. Regents of University of Cal.* (2011) 199 Cal.App.4th 499, 505; *Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467.)

1. *The Trial Court Abused its Discretion in Excluding Raymond's Declaration*

Principles relating to the admissibility and foundation of expert testimony are well established: "[T]he lack of foundation of an expert's testimony can be as to the expert being qualified, the validity of the principles or techniques upon which the expert relied, or as to the reliability and relevance of the facts upon which the expert relied. [Citation.]

"Evidence Code section 720, subdivision (a) provides, 'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.' '[T]he qualifications of an expert must be related to the particular subject upon which he is giving expert testimony.' [Citation.] Consequently, 'the field of expertise must be carefully distinguished and limited' [citation], and '[q]ualifications on related subject matter are insufficient' [citation].

"The foundation required to establish the expert's qualifications is a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in a sufficient number of transactions involving the subject matter of the opinion. [Citations.] 'Whether a person qualifies as an expert in a particular case . . . depends upon the facts of

24

the case and the witness's qualifications.' [Citation.] '[T]he determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for truth.' " (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1114-1115.)

Further, "[a]n expert may rely upon hearsay and other inadmissible matter in forming an opinion. (Evid. Code, § 801, subd. (b).)" (*Howard Entertainment, Inc. v. Kudrow*, *supra*, 208 Cal.App.4th at p. 1115.)[6] But the matter relied upon must " "provide a reasonable basis for the particular opinion offered, and . . . an expert opinion based on speculation or conjecture is inadmissible.' " (*Sargon Enterprises, Inc. v. University of Southern Cal.* (2012) 55 Cal.4th 747, 770; *Howard Entertainment*, at p. 1115.) " '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . . [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?' " (*Sargon Enterprises*, at p. 770.) An expert's opinion given without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because such

---

6    Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Evid. Code, § 801, subds. (a), (b).)

opinion is worth no more than the reasons and facts on which it is based. (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123.)

Our assessment of the adequacy of Valley's opposing summary judgment evidence requires us to liberally construe Raymond's declaration. (*Aguilar*, *supra*, 25 Cal.4th at pp. 844-845.) An opposing party's declaration does not need to be detailed, and it is entitled to all favorable inferences. (*Hanson v. Grode* (1999) 76 Cal.App.4th 601, 607; *Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1332; *Powell v. Kleinman*, *supra*, 151 Cal.App.4th at p. 125.) In making a preliminary determination as to whether an expert opinion is founded on sound logic, we must not decide its persuasiveness, nor weigh the opinion's probative value or substitute our own opinion for the expert's. (*Sargon Enterprises, Inc. v. University of Southern Cal.*, *supra*, 55 Cal.4th at p. 772.) "Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Ibid*.)

Here, Raymond recited the documents on which he relied in expressing his opinion: Valley's job file, demand letters, discovery, Lampel's declaration, and "photographs of the alleged damage." Further, Raymond recounted special knowledge and experience to support his opinions: 49 years of experience in the trade, familiarity with "falling cabinet" claims by reason of having been directly involved in customer service claims, and his experience since 1982 as the person at Valley who would inspect every reported claim where a cabinet fell from the wall to which it was attached. "An expert may rely upon experiences and conversations he or she has had and information he

26

or she has obtained without the necessity of providing the specifics of such experiences and conversations." (*Howard Entertainment, Inc. v. Kudrow*, *supra*, 208 Cal.App.4th at p. 1117.)

We conclude Raymond reasonably relied on these matters in reaching his conclusions; such matters provide a sufficient basis for his opinion as to how and when damage will occur from a defectively installed utility wall cabinet, and his reliance on them did not result in him making a "leap of logic or conjecture." (*Sargon Enterprises, Inc. v. University of Southern Cal.*, *supra*, 55 Cal.4th at p. 772; accord, *Jennifer C. v. Los Angeles Unified School Dist.*, *supra*, 168 Cal.App.4th at p. 1332.) Raymond explained the bases for his conclusions as to the mechanism and type of damage (the standard uses of a utility cabinet, as well as relative softness and hardness of the cabinet versus the drywall) and why a homeowner such as Lampel would not have observed damage to the paint, caulking or and drywall (that the top of an upper cabinet, where the damage would first occur, was not readily visible). We conclude Raymond had sufficient qualifications, and provided an adequate foundation for his opinions.

Nor can we say Raymond's conclusions were speculative. On this point, Lexington argues Raymond's opinions lacked foundation for the assumed facts, that he engaged in conjecture as to what Lampel did or did not see, and he also contradicted Lampel, who was assertedly the only person to observe "firsthand" the property damage. Lexington criticizes Raymond's opinion for lacking a foundational "photograph or other firsthand evidence of 'property damage' during the Policy period . . . ." It is true that an expert's opinion that " 'something did occur, when unaccompanied by a reasoned

27

explanation illuminating how the expert employed his or her superior knowledge and training to connect the facts with the ultimate conclusion, does not assist the [fact finder.]' " (*Shugart v. Regents v. University of California*, *supra*, 199 Cal.App.4th at p. 508.)  But here, the complaint alleged (and neither party disputes) the cabinet at issue was defectively installed, and, as explained above, Raymond provided sufficient foundation and a reasoned explanation for his conclusions; he was not required to conduct an independent investigation or view the damage firsthand to deduce how it developed.  (See *Schreidel v. American Honda Motor Co.* (1995) 34 Cal.App.4th 1242, 1251-1253 [expert's testimony regarding cause of automobile accident not wild speculation or inadmissible due to lack of scientific testing, product disassembly, or independent investigation]; *Jennifer C. v. Los Angeles Unified School Dist.*, *supra*, 168 Cal.App.4th at p. 1332 [expert's opposing summary judgment opinions (that plaintiff special needs student was vulnerable, it was unreasonable for school staff not to see two special needs students walking across campus, and a particular sweep reasonably done would have caught them) was not conclusory and defeated summary judgment where opinions were based on experience, the facts surrounding the incident, reports prepared by the school district, school records, and psychological assessment of the plaintiff].)

Raymond's observations are not like those of the expert in *Mitchell v. United Nat. Inc. Co.* (2005) 127 Cal.App.4th 457, relied upon by Lexington.  In *Mitchell*, the expert purported to testify about what representations in an insurance application a particular underwriter did or did not find material, and his opinions were based on speculation about what that underwriter knew, considered or concluded.  (*Id*. at pp. 477-478.)  Nor

28

does Raymond's declaration have the flaw observed by the court in *Nardizzi v. Harbor Chrysler Plymouth Sales, Inc.* (2006) 136 Cal.App.4th 1409, in which the expert failed to take into account uncontested facts that made his view of causation both improbable and physically impossible.  (*Id*. at p. 1415; see *Castillo v. Toll Bros., Inc.* (2011) 197 Cal.App.4th 1172, 1202, fn. 18.)  Unlike in *Nardizzi*, Raymond gave a reasoned explanation why Lampel might not have observed any damage, and Lampel's declaration did not preclude with certainty the cause or existence of property damage that was not readily detectable.

We need not resolve the propriety of the trial court's rulings on Lohse's declaration because, as we explain below, Raymond's declaration alone was sufficient to raise triable issues of material fact as to potential coverage under Lexington's policy.

2.  *Lexington's Claim of "Immaterial" Damage*

Lexington argues that even assuming Valley's experts were qualified and their declarations admissible, their opinions did not create a triable issue of fact.  It maintains, relying on *F & H Construction v. ITT Hartford Insurance Company of the West* (2004) 118 Cal.App.4th 364 (*F & H Construction*) and *Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, that "courts have interpreted the term 'property damage' in an insurance policy to require a *material* change in the affected property."  Because, Lexington asserts, the experts essentially admitted that the damage allegedly caused by the cabinet may have been less significant than chipped paint or drywall dust, there was no material change in the property amounting to property damage within the meaning of the policy.

29

Neither case, however, stands for the asserted proposition. In *F & H Construction*, the issue was whether the welding of inferior-grade steel caps onto another product, steel composite piles, caused property damage—"physical injury to tangible property"—to the piles within the meaning of a CGL policy. (*F & H Construction*, *supra*, 118 Cal.App.4th at pp. 368, 371-372.) It was undisputed that the use of the lesser grade caps produced structural units that were not damaged but were inadequate for their intended purpose. (*Id*. at p. 368.) On review of a grant of summary judgment in the insurer's favor, the appellate court explained that the prevailing view was that "incorporation of a defective component or product into a larger structure does not constitute property damage unless and until the defective component causes physical injury to tangible property in at least some other part of the system." (*Id*. at p. 372.) In reaching that conclusion, the appellate court, in distinguishing cases relied upon by the appellant, agreed with the Illinois Supreme Court's definition of the term "physical injury" as

" 'unambiguously connot[ing] damage to tangible property causing an alteration in appearance, shape, color or in other material dimension.' " (*F & H Construction*, at p. 377, quoting *Travelers Ins. Co. v. Eljer Mfg., Inc.* (Ill. 2001) 197 Ill.2d 278, 312.) The *F & H* court used the word "material" to qualify the *dimension* (such as appearance, shape or color), not the extent of the alteration; the court did not define physical injury to require a *material alteration* in shape, appearance, color or other dimension. The *F & H Construction* court merely held that where the only injury was in the form of a product's failure to perform as intended and the damages were "intangible economic damages" (the

30

cost of modifying the caps and lost bonus for early project completion), there was no physical injury to tangible property within the meaning of the CGL policy. (*F & H Construction*, 118 Cal.App.4th at pp. 373-374.)

*Maryland Casualty Co. v. Reeder*, *supra*, 221 Cal.App.3d 961 similarly involved a circumstance in which the appellate court rejected the notion that mere inclusion of a defective component in property, or mere allegations of inferior materials or workmanship, constitutes "property damage" within the meaning of a policy defining such damage as "physical injury to or destruction of tangible property . . . ." (*Id*. at pp. 968-970.) The court observed that a CGL policy does not provide contractors with coverage against inferior or defective work, but "comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products." (*Id*. at p. 967.) Thus, "where the defect in fact has caused either physical injury to or the lost use of tangible property, liability coverage has been found." (*Id*. at p. 970.) In that case, the homeowners had alleged soil subsidence caused physical harm to tangible property consisting of cracked concrete floor slab, foundations, retaining walls and other areas, as well as failure of the roofs, allowing rain water to damage the building structures and living areas. (*Id*. at pp. 970-971.) This went beyond allegations of mere defects in materials and workmanship, and was held sufficient to allege property damage within the meaning of the CGL policy at issue. (*Id*. at p. 971.) *Maryland Casualty* does not stand for the proposition that "property damage" means a "material change" in the property at issue. Thus, Lexington is incorrect when it asserts generally that appellate courts interpret the definition to require a "*material* change in the affected property."

31

Our focus is on a layman's understanding of the phrase "physical injury to tangible property," in its ordinary and popular sense (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 471) and whether the alteration of the drywall, caulk and paint testified to by Raymond meets that standard. "[I]f the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.) As stated, Lexington's policy defines property damage as "[p]hysical injury to tangible property." The term " '[t]angible property' is not ambiguous, and . . . [c]onsistent with an insured's reasonable expectations, 'tangible property' refers to things that can be touched, seen, and smelled." (*Kazi v. State Farm Fire and Cas. Co.* (2001) 24 Cal.4th 871, 880; *Gunderson v. Fire Ins. Exchange*, *supra*, 37 Cal.App.4th at p. 1119 [" ' "Understood in its plain and ordinary sense, 'tangible property' means 'property (as real estate) having physical substance apparent to the senses' " ' "].) The Merriam-Webster Dictionary defines "physical" as "having material existence: perceptible esp. through the senses" and defines "injury" as "hurt, damage, or loss sustained." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) pp. 644, 935.) It defines "loss" as "destruction, ruin" and "the amount of an insured's financial detriment by death or damage that the insurer is liable for." (*Id.* at p. 738.) The word "physical" in the policy modifies the term "injury" and thus the policy covers only physical loss or damage. (See *Ward General Ins. Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 554.) The requirement that a loss be "physical," given the ordinary definition of that term, is " 'widely held to exclude alleged losses that are intangible or incorporeal, and, thereby to preclude any claim against the property insurer

32

when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.' " (*MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.*, *supra*, 187 Cal.App.4th at pp. 778-779 [defining phrase "direct physical loss" in business property insurance policy], quoting 10A Couch on Insurance (3d ed. 2010) § 148:46, p. 148-8.)[7]

Applying these plain, ordinary definitions, we conclude Valley's evidence raised a material factual issue as to the existence—at least potentially—of a continuing and progressively deteriorating process of property damage that began with normal use of the defectively installed cabinet within the policy period. (Accord, *Century Indemnity Co. v. Hearrean* (2002) 98 Cal.App.4th 734, 739-741, 743 [allegations that contractors and subcontractors negligently designed and constructed improvements at hotel, causing

---

[7] In *MRI Healthcare Center of Glendale v. State Farm General Ins. Co.*, *supra*, 187 Cal.App.4th 766, an issue on the parties' cross-motions for summary judgment was whether the insured suffered "direct physical loss" to an MRI (magnetic resonance imaging) machine within the meaning of a business insurance policy. (*Id*. at pp. 769-770, 777-778.) Addressing the term "direct physical loss," the appellate court stated: "A direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.' [Citation.] . . . For loss to be covered, there must be a 'distinct, demonstrable, physical alteration' of the property." (*Id*. at p. 779.) The court further explained: "For there to be a 'loss' within the meaning of the policy, some *external force* must have acted upon the insured property to cause a *physical change* in the condition of the property, i.e., it must have been 'damaged' within the common understanding of that term." (*Id*. at p. 780.) In that case, the insured's MRI machine did not suffer any "actual physical 'damage' " by virtue of the fact that it was turned off and could not be turned back on. (*Ibid*.) Of course, the Lexington policy here does not require a "direct" physical loss or damage, but the *MRI Healthcare* court's definition of "physical loss" is nevertheless instructive.

33

property damage including leaking windows and cracked exterior stucco, raised triable issue as to whether continuing and progressive property damage occurring within the policy period]; *Pepperell v. Scottsdale Ins. Co.* (1988) 62 Cal.App.4th 1045, 1048-1049, 1055-1056 [implication of complaint was that continuing and progressively deteriorating process began during policy period as a result of defective design and construction, even though damage did not manifest itself until after expiration of the policy period, creating a disputed issue of fact].)  According to Raymond, upon Lampel's normal use of the cabinet in 2006, the defectively installed cabinet would begin to separate from the wall, breaking the caulking and indenting the drywall below the cabinet.  Such alterations would require repairs to both caulk, paint and drywall to return the property to a satisfactory state.  Thus, the evidence creates a triable issue as to whether the cabinet caused "distinct, demonstrable, physical alteration" of tangible property—drywall, caulk and paint—commencing at some point in 2006.

It is of no moment that Lampel did not observe such damage; at best her testimony creates a conflict in the evidence that we do not resolve on summary judgment.  Our role is to find issues for the trier of fact, not resolve them.  (*Saldana v. Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1510.)  Further, we emphasize that we do not reach the merits of whether Valley can ultimately establish coverage under Lexington's policy for the alleged injury and damage alleged in the CCI lawsuit; whether the damages and injuries alleged were in fact continuous and progressive is itself a matter for final determination by the trier of fact.  (*Pepperell v. Scottsdale Ins. Co.*, *supra*, 62 Cal.App.4th at p. 1056, quoting *Montrose II*, *supra*, 10 Cal.4th at p. 694.)

34

The duty to defend "is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is *no* potential for coverage . . . ." (*Montrose I*, *supra*, 6 Cal.4th at p. 295.) Because Valley has demonstrated facts raising the potential that Lexington's policy may cover CCI's claims giving rise to Lexington's duty to defend, we reverse the summary judgment on Valley's breach of contract cause of action.

V.  *Bad Faith Cause of Action*

Breach of an insurance contract does not automatically subject an insurer to tort damages for bad faith. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 345, disapproved on other grounds in *Wilson v. 21st Century Ins. Co.*, *supra*, 42 Cal.4th at p. 724, fn. 7; *Shade Foods, Inc. v. Innovative Products Sales & Marketing Inc.* (2000) 78 Cal.App.4th 847, 881.) Accordingly, it is necessary to decide whether, notwithstanding our conclusion that Valley's evidence raises issues of material fact as to a potential for coverage under Lexington's policy preventing summary judgment on its breach of contract cause of action, Lexington is entitled to summary adjudication of Valley's cause of action for breach of the covenant of good faith and fair dealing. (See *Nazaretyan v. California Physicians' Service* (2010) 182 Cal.App.4th 1601, 1614, fn. 6 [trial court may properly grant summary adjudication of bad faith claim and request for punitive damages in a case alleging breach of an insurance contract and breach of the implied covenant of good faith and fair dealing].)

" 'The law implies a covenant of good faith and fair dealing in every insurance contract. [Citation.] Therefore, when an insurer unreasonably and in bad faith withholds

35

payment on a claim of its insured, it is subject to liability in tort. [Citation.] An insurer may also breach the covenant of good faith and fair dealing when it fails to properly investigate its insured's claim. [Citation.] Under this implied promise, in determining whether to settle a claim, the insurer must give "at least as much consideration to the welfare of its insured as it gives to its own interests." [Citation.]' [Citations] [¶] The linchpin of a bad faith claim is that the denial of coverage was unreasonable. 'Before an insurer can be found to have acted in bad faith for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted unreasonably or *without proper cause*.' [Citation.] 'Where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute.' " (*McCoy v. Progressive West Ins. Co.* (2009) 171 Cal.App.4th 785, 792-793.)

The genuine dispute rule, however, does not relieve Lexington from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. "A *genuine dispute* exists only where the insurer's position is maintained in good faith and on reasonable grounds. [Citations.] Nor does the rule alter the standards for deciding and reviewing motions for summary judgment. 'The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. [Citation.] . . . On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light

36

most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.' [Citation.] Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues [citation] as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith." (*Wilson v. 21st Century Ins. Co.*, *supra*, 42 Cal.4th at pp. 723-724, footnote omitted.)

Asserting that bad faith claims are not amenable to summary adjudication, Valley maintains the evidence shows Lexington conducted an inadequate and unreasonable investigation and, consequently, cannot claim there was a genuine dispute as to coverage. It sets out two reasons why Lexington assertedly failed to conduct a reasonable investigation. First, it argues Lexington analyzed the allegations of the CCI complaint under the wrong policy provisions, and then misrepresented the policy provisions in the denial letter. The premise of this argument, however, is that the continuous loss endorsement's amended definition of "occurrence" was the operative provision. We have already held that Lexington reasonably concluded the continuous loss endorsement was not implicated because CCI's complaint did not allege or suggest the presence of gradual, continuing, or progressive property damage. The damage was alleged to stem from an immediate release of water caused by the cabinet's failure on or about August 4, 2008. Under these circumstances, there was a genuine issue as to Lexington's liability under the policy for the claims against Valley under Lexington's policy expiring six months earlier. We conclude Valley has not presented evidence raising a triable issue as to whether

37

Lexington acted in an unreasonable or arbitrary manner by analyzing coverage under the standard definition of occurrence, and not in light of the definition of occurrence applying "[i]n the event of continuing or progressive . . . 'property damage' over any length of time . . . ."

Second, Valley argues that had Lexington affirmatively investigated facts extrinsic to the third party complaint, including by hiring an expert, it would have discovered the facts recounted by Raymond and Lohse, which potentially trigger coverage under the policy. It is not unreasonable per se for an insurer to decline to conduct further investigation to collect additional information; "[i]n some cases, review of an insured's submitted [information] might reveal an indisputably reasonable basis to deny the claim without further investigation." (*Wilson v. 21st Century Ins. Co.*, *supra*, 42 Cal.4th at p. 723; *Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1240, fn. 27 [citing *Wilson*; insurer's failure to have insured examined by its own doctors was not unreasonable as a matter of law].) Neither Raymond nor Lohse relate in their declarations what they would have said if a Lexington representative had contacted them before denying the claim, and Valley provides no other evidence as to what Lexington would have discovered at the time of its investigation had it contacted an expert. And, a trier of fact cannot reasonably infer that Raymond would have imparted this information to Lexington, because it is undisputed that Valley did not raise the continuous and progressive property damage theory until its second amended complaint in the present action. Of course, had Lexington interviewed Lampel during the course of its investigation (see footnote 3, *ante*), it would not have discovered any indication of

38

damage caused by the cabinet apart from the flooding occurring in August 2008. Thus, there is nothing from which a trier of fact may conclude that, if Valley had interviewed Raymond or Lohse in connection with its investigation before reaching its coverage decision, it would have learned that damage to paint and drywall from the failing cabinet potentially commenced during the policy period, six months or more before the flood. " '[T]he reasonableness of the insurer's decisions and actions may be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors.' " (*Jordan v. Allstate* (2007) 148 Cal.App.4th 1062, 1073.)

In cases where an insurer is found to have unreasonably failed to investigate facts outside the complaint's allegations, there was some indication that the insurer had actual information available to it that suggested coverage under the policy. For example, bad faith may be found where the insurer refuses to collect existing and "readily available" records suggesting coverage. (E.g., *Mariscal v. Old Republic Life Ins. Co.* (1996) 42 Cal.App.4th 1617, 1624 [insurer relied on a short statement in the insured's death certificate that the immediate cause of death was heart failure to deny coverage under the policy without investigating the facts showing the heart failure was the result of complications caused by head injuries suffered in a car accident; it ignored medical records existing at the time it denied the claim and "readily available" statements from percipient witnesses to a car accident alleged to have contributed to insured's death].) It may be found where an insurer " 'look[s] the other way when confronted with facts revealing the possibility of . . . coverage . . . .' " (*Shade Foods, Inc. v. Innovative*

39

*Products Sales Marketing, Inc.*, *supra*, 78 Cal.App.4th at pp. 877-879, 880-882 [bad faith verdict upheld where insurer in part refused to evaluate statements made in "carefully reasoned" letters of the insured's attorneys sent in response to coverage denial letter]; *Frommoethelydo v. Fire Ins. Exch.* (1986) 42 Cal.3d 208, 220 [insurer breached its duty to fairly investigate once it was advised of the presence of witnesses with factual information undermining its prior conclusion that the insured had submitted a false claim].)  Triable issues as to bad faith may exist where an insurer's denial contradicts percipient medical findings without supporting medical reports or opinions.  (See *Wilson v. 21st Century Insurance Co.*, *supra*, 42 Cal.4th at pp. 721-722 [triable issue of material fact as to bad faith presented where insured's examining physician concluded neck injuries were probably due to a recent automobile accident and MRI confirmed bulging discs, but claims examiner rejected coverage without any medical report or opinion on which he could have ignored or disbelieved the doctor's conclusions or any medical basis for the examiner's conclusion that the insured had preexisting disease].)  Triable issues as to bad faith likewise are found where an insurer ignores internal correspondence revealing possible coverage under its policy language, refuses to follow the recommendations of its own experts and others to consult a relevant expert, or declines to interview the property owner, who has awareness of certain damage to her home that may trigger coverage.  (See *Jordan v. Allstate*, *supra*, 148 Cal.App.4th at pp. 1074-1076.)  Such facts can constitute evidence from which a jury could conclude an insurer failed to conduct a full, fair, thorough and timely investigation of the insured's claim.  (*Id*. at p. 1076.)  Valley has not presented such evidence here.

Accordingly, we conclude Lexington was entitled to summary adjudication of Valley's cause of action for violation of the covenant of good faith and fair dealing. Our conclusion also entitles Lexington to summary adjudication of Valley's claim for punitive damages (see Code Civ. Proc., § 437c, subd. (f)(1)), which is premised on allegations that Lexington acted in bad faith and without proper motives in denying the claim. Under the circumstances, Lexington demonstrated that Valley cannot prove by clear and convincing evidence that it acted out of oppression, fraud or malice. (Civ. Code, § 3294, subd. (a).)

DISPOSITION

The judgment is reversed and the matter remanded with directions that the trial court enter a new order denying summary adjudication of Valley Casework, Inc.'s breach of contract cause of action, granting summary adjudication of the cause of action for breach of the covenant of good faith and fair dealing, and granting summary adjudication of Valley Casework, Inc.'s claim for punitive damages. The parties shall bear their own costs on appeal.

O'ROURKE, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.