[No. C042707. Third Dist. May 5, 2004.]

F & H CONSTRUCTION, Plaintiff and Appellant, v.
ITT HARTFORD INSURANCE COMPANY OF THE MIDWEST,
Defendant and Respondent.

366

## COUNSEL

Ryan & Lifter, Joseph D. Ryan and Glenn Gould for Plaintiff and Appellant.

McCormick, Barstow, Sheppard, Wayte & Carruth, Robert K. Landen and Jay A. Christofferson for Defendant and Respondent.

## OPINION

**BLEASE, Acting P. J.**—F & H Construction (F&H) appeals from the judgment in favor of ITT Hartford Insurance Group[1] (Hartford) on the parties' cross-motions for summary judgment.

F&H brought suit against Hartford under a commercial general liability insurance (CGLI) policy issued to Hartford's insured, L. O'Reilly & Son, Inc. (O'Reilly), after O'Reilly declared bankruptcy.

F&H had contracted with Contra Costa Water District to build a water facility pumping plant. F&H entered into a subcontract with O'Reilly for the manufacture and delivery of grade A-50 steel pile caps with a load capacity of 50,000 pounds per square inch. After O'Reilly delivered the pile caps and F&H welded the majority of them to driven piles, F&H discovered the caps were made with grade A-36 steel rather than the agreed upon A-50 grade steel. F&H now seeks damages from Hartford under O'Reilly's CGLI policy for property damage.

The issue tendered by the parties is whether welding inadequate pile caps onto driven piles constitutes property damage under the CGLI policy when there is no physical injury to the piles or to other property, and the defective pile caps are ultimately used as modified to meet design specifications. We hold that under these circumstances, there is no "property damage." We shall therefore affirm the judgment.

[1] Hartford Insurance Company of the Midwest was erroneously sued as ITT Hartford Insurance Group, Inc.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *The Construction Project*

In September 1994, F&H contracted with Contra Costa Water District (CCWD) to build the Los Vaqueros Water Conveyance Facility Pumping Plants (Los Vaqueros). In furtherance of that contract, F&H entered into a subcontract with O'Reilly to supply 113 pile cap extensions to be welded into place on steel composite piles, which are driven into the ground. The specifications for the pile caps required that they be fabricated with grade A-50 steel, which has a load capacity of 50,000 pounds per square inch, referred to as 50 KSI.

Contrary to the project specifications and unbeknownst to F&H, O'Reilly manufactured and delivered grade A-36 steel caps instead of grade A-50 caps. Grade A-36 steel is comprised of steel of varying strengths and potentially includes some steel that lacks the tensile strength of the 50 KSI steel required by the subcontract.

F&H became aware that O'Reilly provided the lesser grade steel caps after it received the results of a mill certification indicating the pile caps did not meet the 50 KSI strength requirement. At that time, all 113 piles had been driven into place and 79 of the 113 pile caps made of grade A-36 steel had been welded onto 79 of the piles. Thirty-four caps had not yet been welded into place. The use of the lesser grade steel caps produced structural units which were not damaged but were inadequate for the intended purpose of supporting the pumping facility.[3]

In order to avoid the prohibitive cost of removing 79 piles at a cost of $30,000 to $40,000 each, eliminate delay, and not damage the piles by cutting off the 79 pile caps already welded into place, F&H decided to modify the

---

[2] The material facts are essentially undisputed. Where they are disputed we so state.

[3] F&H argues that welding the grade A-36 caps to the piles damaged the piles. Hartford contends the question of damage to the piles is a question of law not of fact because Hartford does not dispute that the pile caps fabricated by O'Reilly were defective or that welding them onto the piles rendered the structural unit inadequate.

The undisputed evidence supports Hartford's position. F&H relies on the declarations of George Tardiff and George Malpass, who both declared in support of F&H that by welding the defective caps to the piles, the piles were weakened to the strength of the lesser-strength pile cap. This is a question of semantics. As Malpass also stated, by welding the defective cap to the pile, the structural unit was rendered inadequate for its intended purpose but was not actually weakened as a unit. This was further supported by the deposition testimony of Eugene George, construction manager for F&H, that welding the defective caps onto the piles did not damage the piles or weaken the steel sleeve in the piles, and for that reason, the piles did not have to be pulled out.

existing grade A-36 pile caps to meet design requirements. Stiffener ribs or fins made of grade A-50/252 steel were designed and welded onto the grade A-36 pile caps and used with the original piles. The stiffener ribs provided the needed strength to avoid potential deforming, ripping, tearing, moving or failure of the caps in case of earthquake or other ground movement.

The modifications were carried out in two phases. The first phase consisted of modifying the 79 pile caps which had already been welded onto the piles. These caps were referred to as "Phase I" or "field" caps. The second phase consisted of modifying the 34 unwelded caps and then welding them as modified to the remaining 34 piles. These were referred to as "Phase II" or "shop" caps. By so modifying the pile caps, F&H was able to complete the project using the original piles and pile caps without damaging or weakening the piles in any way. The Los Vaqueros project was completed on time and no liquidated damages were assessed against F&H.[4]

B. *Procedural History*

On February 24, 1998, F&H filed suit against O'Reilly seeking recovery of damages in excess of $200,000. In March of that same year, O'Reilly filed a voluntary petition for bankruptcy, which stayed F&H's civil suit against O'Reilly. The bankruptcy court granted F&H's petition to lift the stay for the limited purpose of pursuing the civil action to obtain O'Reilly's insurance assets. O'Reilly did not respond to F&H's complaint and on June 13, 2000, the superior court entered a default judgment against O'Reilly in the amount of $243,064.37.

F&H then filed the present suit against Hartford for damages and breach of contract seeking $243,064.37. The suit was brought under a CGLI policy issued by Hartford to O'Reilly covering "property damage."

The parties filed cross-motions for summary judgment. By written opinion, the trial court granted Hartford's motion, denied F&H's motion, and entered summary judgment in favor of Hartford. F&H filed a timely appeal from the judgment.[5]

---

[4] In addition to liquidated damages, the contract between F&H and CCWD included a bonus of $2,500 for each day the project was completed ahead of the completion date set by CCWD. Because the time needed to modify the pile caps slowed the completion of the project, F&H did not receive any bonus for early completion.

[5] Hartford contends the notice of appeal is untimely because it was filed beyond the 60-day statutory time limit. We disagree. The notice of appeal states that F&H appeals from the order granting Hartford's motion for summary judgment entered September 18, 2002, and the order denying F&H's motion for summary judgment, ordered on August 27, 2002. The notice of appeal also states however, that Hartford served it with notice of entry of judgment on

## DISCUSSION

F&H contends welding the grade A-36 pile caps to the driven piles constitutes property damage within the meaning of the CGLI policy issued by Hartford to O'Reilly. Hartford contends F&H has failed to establish "property damage" as defined under the policy because there was no "physical injury" to the piles or to other property. We agree with Hartford.

### A. *Standard of Review*

■ A motion for summary judgment shall be granted when "all the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 356 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) We review the trial court's decision de novo to determine whether there is a triable issue of material fact, considering all the evidence the parties offered in connection with the motion and the uncontradicted inferences the evidence reasonably supports. (Code Civ. Proc., § 437c, subd. (c); *Merrill v. Navegar, Inc., supra,* at p. 476.)

■ A moving party defendant is entitled to judgment as a matter of law when one or more elements of the plaintiff's case cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subds. (a) and (o)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493]; *Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 356.)

■ As the party claiming under the insurance policy, F&H has the burden of establishing that its claim is within the basic scope of coverage, i.e. that it suffered "property damage" within the meaning of the policy issued by Hartford. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 16 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 803 [26 Cal.Rptr.2d 391].)

■ Here, the material facts are undisputed and the interpretation of an insurance policy is a question of law which we review de novo. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18; *Marie Y. v. General Star Indemnity Co.* (2003) 110 Cal.App.4th 928, 950 [2 Cal.Rptr.3d 135]; *Economy Lumber Co. v. Ins. Co. of North America* (1984) 157 Cal. App.3d 641, 645 [204 Cal.Rptr. 135].) We shall therefore consider the parties'

September 24, 2002. The notice of appeal was therefore timely filed on November 21, 2002, within the 60-day period. Cal. Rules of Court, rule 2(a)(2).)

cross-motions for summary judgment as one to determine the legal issue before us. That question is whether welding defective pile caps to driven piles constitutes property damage within the meaning of the CGLI policy solely because the welded unit was inadequate to meet contractual design specifications.

### B. *Rules of Construction*

■ In construing an insurance contract, we give effect to the mutual intention of the parties. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821 [274 Cal.Rptr. 820, 799 P.2d 1253]; *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666 [42 Cal.Rptr.2d 324, 913 P.2d 878].) The parties' intent is determined by looking first to the language of the policy to determine its plain meaning interpreted in its ordinary and popular sense. (*AIU Ins., supra,* 51 Cal.3d at p. 822; *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18.) Where the meaning is clear and unambiguous, we apply that meaning. (Civ. Code, § 1649; *Montrose Chemical Corp., supra,* 10 Cal.4th at p. 667.) In so doing, we must give meaning to each word in the contract. (Civ. Code, § 1641; *Collin v. American Empire Ins. Co., supra,* 21 Cal.App.4th at p. 818.) We therefore turn to the language of the policy.

### C. *The Comprehensive General Liability Insurance Policy*

The CGLI policy issued by Hartford states in pertinent part: "We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' . . . . [¶] . . . if . . . [t]he . . . 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory;' and . . . occurs during the policy period." The policy defines "property damage" in two ways: (1) "Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or . . . [(2)] Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the 'occurrence' that caused it."

The parties do not dispute that an "occurrence" took place within the "coverage territory" and "during the policy period." F&H contends that welding the defective pile caps to the driven piles caused property damage under both definitions. We shall discuss each of these contentions separately.

### D. *Physical Injury to Tangible Property*

■ The policy defines property damage as "[p]hysical injury to tangible property." This definition is the standard definition currently used by the

insurance industry nationwide. (*Esicorp, Inc. v. Liberty Mutual Insurance Co.* (8th Cir. 2001) 266 F.3d 859, 862 (*Esicorp*); see also *Traveler's Ins.Company v. Eljer Manufacturing, Inc.* (2001) 197 Ill.2d 278, 294–299 [757 N.E.2d 481, 491–495, 258 Ill.Dec. 792].) (*Traveler's*). Applying that definition, the prevailing view is that the incorporation of a defective component or product into a larger structure does not constitute property damage unless and until the defective component causes physical injury to tangible property in at least some other part of the system. (*St. Paul Fire & Marine Ins. Co. v. Coss* (1978) 80 Cal.App.3d 888, 892–893 [145 Cal.Rptr. 836] (*St. Paul Fire & Marine*) [defective materials and workmanship in construction of home not physical injury]; *New Hampshire Ins. Co. v. Vieira* (9th Cir. 1991) 930 F.2d 696 [faulty installation of drywall into building not physical injury]; *Federated Mutual Ins. Co. v. Concrete Units, Inc.* (1985 Minn.) 363 N.W.2d 751 (*Federated Mutual*) [defective concrete used in construction of grain elevator not physical injury]; *Esicorp, supra,* 266 F.3d at p. 863 [defective steel pipe sections welded into pipe system not physical injury]; *Traveler's, supra,* 197 Ill. 2nd at pp. 310–311 [757 N.E.2d at pp. 500–502] [defective pipe system used in construction of houses not physical injury]; *Aetna Casualty and Surety Co. v. McIbs, Inc.* (1988 D.C. Nev.) 684 F.Supp. 246 [improperly sized concrete blocks used in building construction not property damage].)

Some courts have even applied this rule to reject property damage claims under policies that define "property damage" to mean "injury to tangible property." (*Fresno Economy Import Used Cars, Inc. v. United States Fidelity & Guaranty Co.* (1977) 76 Cal.App.3d 272, 282, 284 [142 Cal.Rptr. 681] (*Fresno Economy Import Used Cars*) [presence of broken head gasket in automobile not "injury to tangible property"]; *Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co.* (7th Cir. 1975) 508 F.2d 417, 419–420 [defective frames used to manufacture tennis racket not "injury to tangible property"].)

■ Under these cases, property damage is not established by the mere failure of a defective product to perform as intended. (*Traveler's, supra,* 197 Ill.2d 278; *Aetna Casualty & Surety Co. v. McIbs, Inc., supra,* 684 F.Supp. 246.) Nor is it established by economic losses such as the diminution in value of the structure (*New Hampshire Ins. Co. v. Vieira, supra,* 930 F.2d at pp. 700–701; *Federated Mutual, supra,* 363 N.W.2d. 751) or the cost to repair a defective product or structure. (*Fresno Economy Import Used Cars, supra,* 76 Cal.App.3d at p. 284; *New Hampshire Ins. Co. v. Vieira, supra,* 930 F.2d at pp. 700–701; *Chatton v. Nat'l Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 857–858 [13 Cal.Rptr.2d 318].)

These cases are consistent with the basic purpose of liability policies, which, as explained by the court in *Maryland Casualty Co. v. Reeder* (1990)

221 Cal.App.3d 961 [270 Cal.Rptr. 719], "are not designed to provide contractors and developers with coverage against claims their work is inferior or defective. [Citation.] The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer. [Citations.] Rather liability coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products. As one commentator explained: 'This distinction is significant. Replacement and repair costs are to some degree within the control of the insured. They can be minimized by careful purchasing, inspection of material, quality control and hiring policies. If replacement and repair costs were covered, the incentive to exercise care or to make repairs at the least possible cost would be lessened since the insurance company would be footing the bill for all scrap. Replacement and repair losses tend to be more frequent than losses through injury to other property, but replacement and repair losses are limited in amount since the greatest loss cannot exceed the cost of total replacement. If the insured will stand these losses, insurance can be provided more cheaply since the company will be freed from administering many small claims for repairs, and it can set a rate for the more unusual risk of injury to property other than the contractor's work or product. This risk can be the hazardous one since there are no natural limitations on the damage the contractor might do to a homeowner's or a neighbor's property.' (MaCaulay . . . [*Justice Traynor and the Law of Contracts* (1961)] 13 Stan.L.Rev. [812] at pp. 825–826.)" (*Maryland Casualty Co. v. Reeder, supra*, 221 Cal.App.3d at pp. 967–968.)

In short, a liability insurance policy is not designed to serve as a performance bond (*Western Employers Ins. Co. v. Arciero & Sons, Inc.* (1983) 146 Cal.App.3d 1027, 1031 [194 Cal.Rptr. 688]) or warranty of a contractor's product. (*St. Paul Fire & Marine, supra*, 80 Cal.App.3d at p. 893; *Hamilton Die Cast, supra*, 508 F.2d at pp. 419–420.)

■ Applying these principles, we find this case like those cited. The only damages alleged by F&H are the costs of modifying the pile caps and the lost bonus for early completion of the project. These are not recoverable as property damage because they are intangible economic damages rather than damages "to tangible property." (*Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at pp. 17–18; *Fresno Economy Import Used Cars, supra*, 76 Cal.App.3d at p. 284; *Chatton v. National Union Fire Ins. Co., supra*, 10 Cal.App.4th at pp. 857–860; *Nichols v. Great American Insurance Companies* (1985) 169 Cal.App.3d 766, 772 [215 Cal.Rptr. 416]; *Giddings v. Industrial Indem. Co.* (1980) 112 Cal.App.3d 213, 219 [169 Cal.Rptr. 278]; *New Hampshire Ins. Co. v. Vieira, supra,* 930 F.2d at pp. 700–701.)

It is undisputed the grade A-36 pile caps were an inferior product and not in compliance with the contract's design specifications. However,

welding the caps to the driven piles did not damage the piles or any other property; it merely rendered the piles inadequate for their intended purpose, and as noted, commercial risk is not covered by liability insurance. (MaCaulay, *Justice Traynor and the Law of Contracts, supra,* 13 Stan.L.Rev. at pp. 825–826; *Maryland Casualty Co. v. Reeder, supra,* 221 Cal.App.3d at pp. 967–968.) Moreover, F&H was able to modify the grade A-36 caps and use them along with the original piles to create an adequate structural unit that met the contractual requirements. Once modified, the caps served their intended purpose, further supporting the inference that the caps did not damage the piles or any other component of the piles.

Although F&H argues that removal of the welded caps would have damaged the piles, that fact has no bearing on the question whether there was physical injury. The undisputed evidence establishes that the piles were not removed and did not have to be removed to be adequately modified.

The cases relied on by F&H (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [52 Cal.Rptr.2d 690] (*Armstrong*); *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847 [93 Cal.Rptr.2d 364] (*Shade*); *Eljer Manufacturing, Inc. v. Liberty Mutual Ins. Co.* (7th Cir. 1992) 972 F.2d 805 (*Eljer*)) are not controlling. *Armstrong* and *Shade* are inapposite because they involved contamination by hazardous materials, while *Eljer* has been soundly rejected because it failed to give the full and ordinary meaning to the policy's definitional words "physical injury." To place these cases in the proper perspective, we first provide some historical background.

Prior to 1973, the standard CGLI policies defined "property damage" as "injury to or destruction of tangible property." (See *Esicorp, supra,* 266 F.3d at p. 862; *Traveler's, supra,* 197 Ill.2d at pp. 294–299 [757 N.E.2d at pp. 492–495].) Applying that definition, a number of courts held that coverage for "property damage" includes the diminution in the value of the building resulting from the incorporation of a defective component. (*Ibid*; see *Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 565 [334 P.2d 881] (*Geddes*); *Hauenstein v. St. Paul-Mercury Indem. Co.* (1954) 242 Minn. 354, 358 [65 N.W.2d 122, 125] (*Hauenstein*); *Western Cas. & Sur. Co. v. Polar Panel Co.* (8th Cir. 1972) 457 F.2d 957, 961.) Beginning in 1973, the definition of "property damage" in the standard CGLI policy was changed to "*physical* injury to or destruction of tangible property." Giving this new definition its plain and ordinary meaning, the majority of courts hold that it does not cover economic damages. (*St. Paul Fire & Marine, supra,* 80 Cal.App.3d at pp. 892–893; *Esicorp, supra,* 266 F.3d at p. 863; *Federated Mutual, supra,* 363 N.W.2d at p. 756; *Wyoming Sawmills, Inc. v. Transportation Ins. Co.* (1978) 282 Ore. 401 [578 P.2d 1253, 1256–1257]; *Traveler's, supra,* 197 Ill.2d at p. 296 [757 N.E.2d at p. 493].)

Turning to the cases cited by F&H, in *Armstrong, supra*, 45 Cal.App.4th 1, the court held that installation of asbestos in a building constitutes compensable property damage to the building under a CGLI policy defining "property damage" as "physical injury to tangible property." The court relied on the trial court's finding that upon release of asbestos fibers into the building's air supply and onto the building's surfaces " '[t]he area becomes hazardous and certain measures must be taken to restore the surface to its prior condition.' " The court therefore applied the cases which hold that "contamination of buildings and their contents from released fibers constitutes a physical injury . . . ." (*Id.* at p. 90; see cases cited therein.) In so doing, the court distinguished the incorporation of defective product cases cited *ante,* reasoning that the rule in those cases "is designed to limit the liability coverage of contractors against claims of defective materials or poor workmanship, for such claims are a commercial risk which is not passed on to the liability insurer." (*Id.* at p. 92.)

Similarly, *Shade, supra*, 78 Cal.App.4th 847, involved the manufacture of nut clusters composed of small pieces of almonds and other nuts held together with congealed syrup. The clusters were sold to General Mills for inclusion in its breakfast cereal, "Clusters." Wood splinters were subsequently found in the nut clusters used in the boxed cereal. The nut clusters were returned to Shade and the contaminated boxes of cereal were destroyed. Relying on *Armstrong, supra*, 45 Cal.App. 4th 1, the court concluded the contaminated nut clusters caused property damage to the boxed cereal, stating "we see no difficulty in finding property damage where a potentially injurious material in a product causes loss to other products with which it is incorporated." (78 Cal.App.4th at p. 865.)

While we do not disagree with the conclusion reached in *Shade*, we disagree with the court's reliance on *Geddes, supra*, 51 Cal.2d 558, and *Eljer, supra*, 972 F.2d 805 because *Geddes*, involved a pre-1973 CGLI policy, which defined "property damage" as "injury to or destruction of tangible property." Applying the rule stated in *Hauenstein, supra*, 242 Minn. 354 [65 N.W.2d 122], the *Geddes* court concluded that the incorporation of defective aluminum doors in a house constituted property damage on the theory the doors caused a diminution in the value of the house. (51 Cal.2d at p. 565.)

Although the CGLI policy in *Shade* defined "property damage" under the new definition, the court relied on *Geddes* without acknowledging or discussing the significance of the difference of definitional language. We therefore find its reliance on *Geddes* misplaced.

We also decline to follow *Eljer, supra,* 972 F.2d 805, where a majority of the Seventh Circuit held that installation of a defective but functioning

plumbing system into a larger structure constituted "property damage." The policy in question defined "property damage" as "physical injury to tangible property." Declining to give the policy language a literal interpretation (*id.* at p. 810), the majority applied the incorporation of defective products rule, concluding that "physical injury" means "a loss that results from physical contact, physical linkage, as when a potentially dangerous product is incorporated into another and, . . . must be removed, at some cost, in order to prevent the danger from materializing." (*Ibid.*)

In a strong dissent, Judge Cudahy criticized the majority opinion in *Eljer*, pointing out "[t]here is immediately something counterintuitive about saying that physical injury has been done to a house in which a functioning plumbing system has been installed. Of course when we determine later (years later) that a good number of the systems will fail—five percent in this case—then perhaps there is a sense in which the 'injury' was present from the moment of installation: this is the majority's 'ticking time bomb' metaphor. But is there *physical* injury? The majority believes that interpreting the phrase is all a matter of emphasis—'*physical* injury' versus 'physical *injury*.' In my view, the phrase must be interpreted as '*physical injury*,' with both words given effect. The majority's account cannot give both words meaning at the same time. Something physical occurs when the plumbing is installed—but it is not injury; and we might say that there is injury (of a sort) when the plumbing is installed—but it is not physical." (*Eljer, supra,* 972 F.2d at p. 814.)

We find the dissent in *Eljer* more persuasive; nor are we alone in that view. The majority opinion in *Eljer* is based upon Illinois law and the Illinois Supreme Court has expressly and soundly rejected it. (*Traveler's, supra,* 197 Ill.2d at pp. 303–312 [757 N.E.2d at pp. 497–502].) *Traveler's* involved the same facts and policies discussed in *Eljer*, but held that the mere incorporation of a defective but functioning plumbing system that might fail in the future did not constitute "property damage" as defined in the CGLI policy. Unlike the majority in *Eljer*, the court in *Traveler's* found no ambiguity in the definition of the term "physical injury." It gave the words their ordinary meaning, finding that "physical injury" "unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension." (*Id.* at pp. 312 [757 N.E.2d at p. 502].) The court therefore concluded that the majority in *Eljer* erred in allowing economic damages by ignoring the ordinary meaning of the term "physical injury." (*Id.* at p. 304 [at p. 497].)

We agree with the court's reasoning in *Traveler's* that the majority opinion in *Eljer* strayed from prevailing law by failing to give ordinary meaning to the definition of "property damage." As noted, when construing the terms of an

insurance contract, a court may not render some words meaningless. (Civ. Code, § 1641; *Collin v. American Empire Ins. Co., supra,* 21 Cal.App.4th at p. 818.) The definition of "physical injury" stated in *Traveler's* gives full commonsense meaning to both "physical" and "injury" and is consistent with the purpose of CGLI policies.

We therefore hold that welding the lower grade pile caps to the driven piles does not constitute physical injury to tangible property where the only injury shown is the welded structure's failure to perform as intended.

### E. *Loss of Use of Tangible Property*

We next consider whether F&H suffered "property damage" under the second definition of that term, i.e. "[l]oss of use of tangible property that is not physically injured."

The court in *Collin v. American Empire Ins. Co., supra,* 21 Cal.App.4th at page 818, explained the meaning of the phrase "loss of use," quoting from 23 California Jurisprudence Third: " 'The measure of damages for the loss of use of personal property may be determined with reference to the rental value of similar property which the plaintiff can hire for use during the period when he is deprived of the use of his own property.' (23 Cal.Jur.3d, Damages, § 69, pp. 129–130 . . . .)" (Italics omitted.)

F&H does not seek damages for the rental value (or its equivalent) for the loss of the use of the Los Vaqueros facility during the time period modifications were made to the pile caps, or even for a period of time caused by delay. The likely reason for this is the fact the project was completed on time. As noted, the only costs claimed by F&H are the costs for repairing and modifying the defective caps and for loss of the early completion bonus. Those costs are unrelated to rental value. F&H has therefore failed to establish its damages are covered by the policy as "property damage." A contrary conclusion would allow contractors and developers to obtain liability insurance for inferior or defective workmanship, a risk not covered by commercial liability insurance. (*Maryland Casualty Co. v. Reeder, supra,* 221 Cal.App.3d at pp. 967–968; see also *Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141, 1156 [120 Cal.Rptr.2d 162].) Accordingly, we conclude the trial court properly granted summary judgment in favor of Hartford on the grounds F&H failed to establish it suffered property damage within the meaning of the CGLI policy issued by Hartford.

## DISPOSITION

The summary judgment in favor of ITT Hartford Insurance Company of the Midwest is affirmed. As the prevailing party, Hartford is awarded its costs on appeal. (Cal. Rules of Court, rule 27(a)(1).)

Morrison, J., and Robie, J., concurred.