Filed 5/16/14   Certified for publication 6/13/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| REGIONAL STEEL CORPORATION, | B245961 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC464209) |
| v. | |
| LIBERTY SURPLUS INSURANCE CORPORATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rolf M. Treu, Judge.  Affirmed.

George Chuang & Associates and George Chuang for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Frank Falzetta, James F. McShane and Brenda Bissett for Defendant and Respondent.

————————————

Regional Steel Corporation (Regional) appeals judgment entered in favor of its insurer, Liberty Surplus Insurance Corporation (Liberty). The trial court found that Liberty had no duty to defend Regional against claims brought by JSM Construction, Inc. (JSM) arising out of Regional's installation of defective steel framing in an apartment building JSM was constructing. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1. *The Florentine Project*

JSM Florentine, LLC (JSM Florentine) is the owner of an apartment building, the Florentine Apartments, under construction in North Hollywood in 2004 (Florentine Project). The Florentine Project complex consists of 14 stories, including retail space on the ground floor, four floors of parking, and 180 residential units on the upper floors. JSM was the general contractor on the project. Regional Steel was a subcontractor engaged pursuant to a June 4, 2004 subcontract to provide reinforcing steel to the Florentine Project's columns, walls, and floors. Webcor Construction LP (Webcor) was engaged to supply and pour concrete to encase Regional's rebar skeleton.

From May through September 2004, Regional prepared and submitted shop drawings that used both 90 degree and 135 degree seismic tie hooks in shear walls. JSM and the structural engineer for the project, Babayan & Associates (Babayan), approved the drawings. In October 2004, Regional began construction on the project, using both the 90 degree and 135 degree seismic hooks as approved in the shop drawings. Webcor poured concrete encasing the rebar and tie hooks.

In January 2005, a City building inspector issued a correction notice requiring the exclusive use of 135 degree hooks. In April 2005, JSM became aware of the problem and informed Regional that it needed to use 135 degree hooks. On May 3, 2005, JSM stopped the pouring of concrete pending resolution of the hook issue. Regional Steel immediately began to fabricate 135 degree hooks. In June 2005, the City notified JSM that garage levels one through three, and some on level four, had defective tie hooks and required repair. JSM refused to pay Regional's invoices and withheld $545,000.

2

## 2.   *The Policy*[1]

In August 2005, JSM purchased a commercial liability policy from Liberty (Policy) with an effective date of August 5, 2005. Liberty added Regional as an additional named insured, effective as of October 5, 2005. The Policy consists of various standard, preprinted ISO (Insurance Services Organization) forms, as well as several endorsements, including a Wrap Endorsement converting the Policy into a "wrap" policy specific to the Florentine Project. The Policy provides in relevant part that Liberty will "pay those sums the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." The Policy applies to "'property damage'" caused by an "'occurrence'" that takes place on or after the policy's "Retroactive Date" of August 5, 2005. Through a series of endorsements, the Policy was extended to November 5, 2008.

The Policy excludes coverage for "'[p]roperty damage'" to "'impaired property'" or property that "has not been physically injured, arising out of[] [¶] [] [a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work.'" "'Property damage'" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property. . . . [¶] [] Loss of use of tangible property that is not physically injured. . . . shall be deemed to occur at the time of the 'occurrence' that caused it." "'Impaired Property'" is defined as "tangible property, other than 'your product' or 'your work' that cannot be used or is less useful because [] [¶] [] [i]t incorporates 'your product' or 'your work' that is known or thought to be defective,

---

[1] Wrap policies are used to insure large-scale construction projects. "Wrap programs protect all the parties involved in the project (e.g., owner, general contractor, subcontractors, architects and other design professionals) and thus provide coverage for the entire project [citation]. [¶] . . . [¶] Wrap programs are designed to make insurance of construction projects more equitable, uniform and efficient. Because everyone is covered under the same policies, these programs reduce potential disputes among the contracting parties. These programs eliminate the cost of overlapping and duplicative coverage that otherwise would be provided by different members of the project team." (Croskey, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2007) ¶ 7:1490–1491, p. 7E-51.)

deficient, inadequate, or dangerous; . . . [¶] if such property can be restored to use by[] [¶] [] the repair, replacement, adjustment or removal of 'your product' or 'your work.'" An "'[o]ccurrence'" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful condition."[2]

The Wrap Endorsement modified the ISO form by providing that "[t]his insurance applies only to . . . 'property damage' . . . that occurs at a Project Site . . . and arises solely out of that portion of operation performed: [¶] []by . . . an Additional Named Insured; [¶] [] that are within the scope of a Designated Project listed in the Designated Project Schedule; and [¶] [] at the Project Site listed for that Designated Project."

The Wrap Endorsement did not specify a retroactive date or an occurrence date.

### 3. The Underlying Action

In August 2007, Regional Steel filed an action against JSM for payment of $545,201.31.

On or about September 18, 2007, JSM filed a cross-complaint against Regional Steel and other subcontractor entities, including Babayan, Webcor (the concrete subcontractor), and Quality Assurance International, Inc. (the quality inspection consultant), asserting claims against each entity for breach of contract and breach of express and implied warranties. JSM contended that Regional Steel failed to comply with the subcontract and building code when it installed horizontal reinforcement for the parking garage by installing 90 degree tie hooks, and as a result JSM was required by the City to make repairs that required it to open up numerous locations in the concrete walls, weld reinforcements to the steel placed by Regional, and otherwise strengthen the inadequate installation.

---

[2] The Policy also excludes at paragraph 2, subsection (j) "(5) [t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations; or [¶] (6) [t]hat particular part of any property that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it." The applicability of this exclusion is not at issue in this appeal.

4

JSM's claims against Webcor alleged that Webcor poured its concrete in and around Regional's reinforcing steel, which did not contain the required 135 degree hooks, and JSM alleged that Babayan permitted Regional to install the defective hooks and failed to prevent Webcor from pouring concrete around the defective hooks, and further that Quality Assurance permitted Webcor to pour concrete without first verifying that the proper tie hooks were used. JSM alleged that it was damaged because completion of the project was delayed, resulting in loss of use, loss of rental income, and other damages. On July 14, 2008, JSM filed a first amended cross-complaint in the underlying action (FACC) adding claims based upon theories of negligence, negligent interference with economic advantage, and asserted claims against the parties' performance bonds.

In August 2009, Webcor filed a first amended cross-complaint seeking indemnity, contribution, and declaratory relief against JSM, Regional and Babayan. Webcor's allegations were conclusory in nature: Webcor alleged its fault was passive and secondary and sought to hold Regional liable for any and all damages for which Webcor might be liable to JSM.

### 4. Regional's March 2008 and August 2009 Tenders

By letter dated March 11, 2008, Regional tendered the defense of JSM's cross-complaint in the underlying action to Liberty. Liberty acknowledged the tender and by letter dated April 25, 2008, declined coverage. Liberty asserted that no damage to property was alleged, and the purely economic losses caused by the need to reopen the poured concrete to correct the tie hook problem did not constitute property damage within the meaning of the Policy. Further, the tie hook problem did not constitute an "occurrence" within the meaning of the Policy because the alleged damage was not caused by an accident. After receiving no response from Regional, Liberty closed the file on the claim on June 5, 2008.

On August 26, 2009, Regional again tendered its claim to Liberty. The new tender was based on Regional's assertion that Webcor believed that JSM was asserting claims based upon the out-of-level concrete floors and resulting cracks in the slabs at levels P1

5

through P3, and that was the basis on which Webcor sought indemnity in its FACC. In support, Regional submitted discovery consisting of three deposition excerpts regarding cracking of the concrete floors poured by Webcor.

Liberty reviewed the tender (which also included the subcontract, JSM's FACC, Webcor's proposed FACC) and saw no evidence that JSM was asserting claims for out-of-level floors. Liberty submitted the tender to outside counsel for further evaluation, and Liberty obtained an opinion from independent counsel (Ropers Majesky Kohn Bentley) that the second tender did not state a claim. Neither JSM nor its outside counsel was able to confirm a claim for out-of-level floors based upon a review of the pleadings and motions from the underlying action, as well as the discovery.

On February 4, 2010, Liberty denied Regional's second tender. Liberty asserted that it never received any evidence from Regional that supported its claim that it was seeking damages for uneven floors, cracked concrete, or concrete edge curl. Rather, the tender described concrete that set improperly and other problems with the floors, but did not mention a claim by JSM against Regional for the cost of repairing out-of-level floors or the tie hook problem.

Sometime in October 2009, Regional, JSM, Webcor and Babayan settled the underlying action. In the settlement agreement (to which Liberty was not a party), the recitals set forth that Regional "caused or was responsible for damage to, and loss of use of, tangible property at the PROJECT, including but not limited to out-of-level, cracked or otherwise damaged floors" and that the parties released all claims against Regional including those for "damage to and/or loss of use of tangible property at the PROJECT, out-of-level, cracked or otherwise damaged floors."

5. *Regional's Complaint Against Liberty*

Regional's complaint against Liberty filed June 23, 2011 alleged claims for breach of contract, breach of the implied covenant of good faith and fair dealing (duty to defend), and breach of the implied covenant of good faith and fair dealing (duty to settle).

6

### 6.     *Liberty's Motion for Summary Judgment*

On June 28, 2012, Liberty filed its motion for summary judgment or in the alternative summary adjudication of issues against Regional.  Liberty asserted that the Policy's insuring clause for property damage did not cover intangible economic loses or nonperformance of contractual obligations based on a defective product or diminution in value of the project caused by the defective tie hooks; damages from the tie hooks did not arise from an "occurrence" as defined in the Policy because an occurrence could not arise from the deliberate act of an insured; and even if Regional's intentional placement of improper 90 degree seismic hooks in the shear walls constitute "property damage" caused by an "occurrence," the Policy's exclusions for damage to impaired property or property not physically injured eliminated any potential for coverage.

Regional responded that JSM's FACC asserted claims for damage to property and loss of use of tangible property based on JSM's allegations that it needed to repair damage to the garage by opening walls and floors to install support columns.  Regional relied on *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 (*Armstrong*), where the court found property damage within an insurance clause based on the incorporation of asbestos tiles and insulation into a building because the potentially hazardous material was physically linked to the building.  Further, JSM's claims for damaged flooring and cracked concrete were damage to "other property" sufficient to distinguish the case from *F&H Construction v. ITT Hartford Ins. Co.* (2004) 118 Cal.App.4th 364 (*F&H Construction*), which held that to bring defective construction within the insuring clause, the "damage" must be damage to property other than the property upon which the insured had worked.  Regional also contended that the Wrap Endorsement omitted any mention of the Retroactive Date, and the impaired property exclusion did not apply because the exclusion applies only where no other property was damaged.

In support of its opposition, Regional submitted deposition testimony where JSM questioned Jeffrey West of Webcor in deposition about floor repair.  West testified that

there were two areas where the floor needed repair because "the concrete went off." Webcor "bushed" it and "chipped" it, and put a material on top of it. West believed the cause of the problem was that the concrete "set up too" fast. One area of the concrete had set faster than another. There was a problem with the out-of-level floors where the concrete had set in some places but not others. Scott Lansburg of JSM, testified in deposition that some of the slab in level P2 of the garage was cracked. He was asked about repair procedure, which involved a "common procedure called epoxy injection." Lansburg did not observe any cracking in the walls on P2.

### 7. Trial Court Ruling

The trial court found that Liberty had no duty to defend Regional. The court found that the parties' papers revealed there were no disputed material facts and thus any evidentiary objections were overruled.[3] The court found the Policy excluded coverage for property damage arising out of a defect, deficiency, inadequacy or dangerous condition of the insured's work, or a delay or failure by an insured to perform a contract in accordance with its terms. Further, coverage was excluded for impaired property because such property was defined as tangible property, other than the insured's work known or thought to be defective deficient, inadequate or dangerous, "if such tangible property [could] be restored to use by repair, replacement, adjustment or removal of the insured's product or work, or the insured fulfilling the terms of the contract."

The court found the JSM FACC only alleged facts arising out of the damage caused by the defective seismic hooks and did not allege any facts of any other damages attributable to Regional. Under the terms of the Policy, the seismic hook issue and Liberty's costs to repair it did not constitute property damage under *F&H Construction*, *supra*, 118 Cal.App.4th at pp. 371–373. The court disagreed that the Wrap Endorsement removed the conditions regarding "occurrence" and "Retroactive Date" because the Policy was to be construed as a whole. With respect to the Webcor FACC, the court

---

[3] Neither party has raised on appeal any contentions with respect to the trial court's evidentiary rulings.

8

found that the JSM FACC asserted damages attributable to Webcor's concrete which was not asserted against Regional, and thus the Webcor FACC did not establish that JSM asserted covered damages against Regional.

The court acknowledged that while the JSM FACC was broad enough to allege facts apart from the seismic issue, the insured could not speculate about unpleaded third party claims to manufacture coverage. Further, the deposition testimony did not establish that JSM asserted claims against Regional based upon faulty concrete. Finally, the court observed there was no evidence that the Settlement Agreement was ever submitted to Liberty.

**DISCUSSION**

Regional contends that the Wrap Endorsement replaced the requirement that property damage result from an occurrence prior to the retroactive date with the requirement that the property damage occur "at a Project Site" and "arise solely out of that portion of operation performed." Second, Regional contends that the incorporation of its seismic hooks into the Florentine Project constituted property damage and was an occurrence within the meaning of the Policy and gave rise to the duty to defend, principally relying on *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, *Armstrong*, *supra*, 45 Cal.App.4th 1, and *Eljer Mfg. v. Liberty Mut. Ins. Co.* (7th Cir. 1992) 972 F.2d 805 (*Eljer*). Further, the underlying claims involved damage to concrete flooring, slabs, and wall, which were the basis of Webcor's cross-complaint for indemnity and damage to Webcor's work, and these underlying claims constituted property damage apart from the defective tie hooks sufficient to qualify for coverage. Regional argues the underlying action involved claims for loss of use and other damages resulting from delays in the completion of the Florentine Project and thus satisfied the "loss of use" portion of the policy. Addressing the impaired property exclusion, Regional contends the exclusion applies only if no other property was damaged and the insured's product was in fact defective, which is not the case here because there was additional damage because the floors were not level. Liberty responds

9

that the defective steel work is not "physical injury to tangible property" and the destructive work required to repair it did not transform it into property damage caused by an occurrence; neither the pleadings nor evidence support Regional's contention that JSM alleged a claim to property other than Regional's own work; the Wrap Endorsement did not modify the Policy because the endorsement must be construed with the Policy as a whole; and Regional failed to establish an occurrence within the Retroactive Date of the Policy.

## I.      STANDARD OF REVIEW

In a motion for summary judgment, the moving party "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850.) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action." (§ 437c, subd. (p)(1); *Aguilar*, at p. 850.) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850.) Where summary judgment has been granted, we review the trial court's decision de novo, "considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) To defeat summary judgment, the plaintiff cannot rely on allegations of the complaint and must show specific facts. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1385–1386.)

## II.      DUTY TO DEFEND

An insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. (*Waller v. Truck Ins. Exchange, Inc*. (1995) 11 Cal.4th 1, 19.) "Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an

10

insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]" (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081.) "Thus, when a suit against an insured alleges a claim that potentially could subject the insured to liability for covered damages, an insurer must defend unless and until the insurer can demonstrate, by reference to undisputed facts, that *the claim cannot be covered*. In order to establish a duty to defend, an insured need only establish the existence of a potential for coverage; while to avoid the duty, the insurer must establish the *absence* of any such potential. [Citation.]" (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1186.) Doubts concerning the potential for coverage and the existence of duty to defend are resolved in favor of the insured. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 299–300.)

Whether the insurer owes a duty to defend usually is made by comparing the allegations of the complaint with the terms of the Policy. (*Waller*, *supra*, 11 Cal.4th at p. 19.) The insurer's defense duty is obviated where the facts are undisputed and conclusively eliminate the potential the policy provides coverage for the third party's claim. (*Ibid.*) An insurer is entitled to summary judgment that no potential for indemnity exists if the evidence establishes no coverage under the policy as a matter of law. (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 414.) We review an order granting summary judgment de novo """"when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy."""" (*Id.* at p. 414; see also *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 ["When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract"].)

"Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647.) The principal rule of contract interpretation is to give effect to the parties' intent as expressed in the terms of the contract. (*Bay Cities Paving & Grading, Inc. v.*

11

*Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867.)  Insurance policy terms will be given the objectively reasonable meaning a lay person would ascribe to them.  (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.)  In addition, the context in which a term appears is critical.  '"[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case . . . ."'  (*Bay Cities Paving*, *supra*, 5 Cal.4th at p. 867, italics omitted.)  "While 'reliance on [the] common understanding of language is bedrock[,] . . . [e]qually important are the requirements of reasonableness and context.'"  (*Ibid.*)

An insurance policy provision is considered to be ambiguous when it is capable of at least two reasonable constructions.  If we cannot eliminate an ambiguity '"by the language and context of the policy, [we] invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.'"  (*County of San Diego*, *supra*, 37 Cal.4th at p. 415.)

To that end, an insurance policy's coverage provisions must be interpreted broadly to afford the insured the greatest possible protection, while a policy's exclusions must be interpreted narrowly against the insurer.  (*MacKinnon*, *supra*, 31 Cal.4th at p. 648.)  The exclusionary clause must be '"*conspicuous, plain and clear*.'"  (*State Farm Mut. Auto. Ins. Co. v. Jacober* (1973) 10 Cal.3d 193, 202.)  "This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded."  (*MacKinnon*, *supra*, 31 Cal.4th at p. 648.)  While the insured has the burden of establishing the claim comes within the scope of coverage, and the insurer has the burden of establishing the claim comes within an exclusion.  (*Ibid.*)  To prevail, the insurer must establish its interpretation of the policy is the only reasonable one.  (*Id.* at p. 655.)  Even if the insurer's interpretation is reasonable, the court must interpret the policy in the insured's favor if any other reasonable interpretation would permit coverage for the claim.  (*Ibid.*)

12

**III.    CONSTRUCTION INSURANCE**

**A.       Wrap Endorsement Did Not Eliminate the Requirement that the Claim Occur During the Retroactive Period**

Regional contends that the Wrap Endorsement replaced the requirement that property damage result from an occurrence before to the "Retroactive Date" with the requirement that the property damage occur "at a Project Site" and "arise solely out of that portion of operation performed." Liberty responds that JSM did not allege an occurrence because Regional installed the tie hooks intentionally, not by accident.

Here, the alleged damages occurred outside of the Policy's undisputed effective date of August 5, 2005 because the City discovered the tie hook problem in January 2005. The Wrap Endorsement does not modify this requirement; rather, it only modifies and/or sets forth the six enumerated items (who is an insured, insuring agreement amendment, products exclusion, products completed operations, other insurance, and additional named insured schedule) that specifically modified the Policy. The remaining provisions of the Policy were unchanged by the Wrap Endorsement. "Endorsements on an insurance policy form a part of the insurance contract [citation], and the policy of insurance with the endorsements and riders thereon must be construed together as a whole [citation]." (*Narver v. California State Life Ins. Co.* (1930) 211 Cal. 176, 181; *Adams v. Explorer Ins. Co.* (2003) 107 Cal.App.4th 438, 451.)

**B**.       **Defective Tie Hooks Do Not Constitute "Property Damage" for Purposes of Coverage Analysis**

The law is in conflict on whether construction defects that are incorporated into a whole property constitute property damages for purposes of a commercial general liability (CGL) policy. One line of cases states the basic rule and denies coverage for the cost of removing and replacing defective work or material, and considers such costs as economic loss, not physical injury to the property. (See, e.g., *F & H Construction, supra,* 118 Cal.App.4th at pp. 372–373; see also *St. Paul Fire & Marine Ins. Co. v. Coss* (1978) 80 Cal.App.3d 888, 892–893 [improper construction does not constitute physical injury

13

to the property because the loss is purely economic].)  Another line of cases suggests that incorporation of a defective part into a whole construction project constitutes property damage within the meaning of a CGL policy.  In *Eljer*, *supra*, 972 F.2d 805, damage resulted to homes from the installation of defective plumbing systems, but no leaking had occurred.  The court in *Eljer* held that "the incorporation of a defective product into another product inflicts physical injury in the relevant sense on the latter at the moment of incorporation—here, the moment when the defective [plumbing] systems were installed in homes."  (*Id*. at p. 814.)

In a case adopting the view of no coverage, *F & H Construction*, *supra*, 118 Cal.App.4th 364, the court rejected coverage for defective construction incorporated into a property.  The insured contractor supplied defective steel pile caps that were welded onto driven piling on a construction project.  Upon discovery of the defect, the general contractor sued the insured for costs to modify the caps to conform to specifications and for loss of bonus for early completion of the project.  As explained in *F & H Construction*, "[t]he prevailing view is that the incorporation of a defective component or product into a larger structure does not constitute property damage unless and until the defective component causes physical injury to tangible property in at least some other part of the system. [Citations.]  [¶] . . . [¶]  Under these cases property damage is not established by the mere failure of a defective product to perform as intended. [Citations.] Nor is it established by economic losses such as the diminution in value of the structure [citations] or the cost to repair a defective product or structure. [Citations.]  [¶] These cases are consistent with the basic purpose of liability policies, which, as explained by the court in *Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, 'are not designed to provide contractors and developers with coverage against claims their work is inferior or defective. [Citation.]  The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer. [Citations.]  Rather liability coverage comes into play when the insured's defective materials or work cause injury to property other than the

14

insured's own work or products. . . .' [Citation.]" (*F & H Construction*, *supra*, 45 Cal.App.4th at pp. 372–373.)

On the other hand, other cases hold that where the defective work or material must be removed or repaired to comply with building code or health and safety standards, its presence constitutes physical injury to the building—the physical linking of the defective material to the building is the physical injury. In *Armstrong*, *supra*, 45 Cal.App.4th 1, the court held that installation of the insured's asbestos material constituted physical injury to the building, even before any release of asbestos fibers: "'[P]hysical injury' covers 'a loss that results from physical contact . . . , as when a potentially dangerous product is incorporated into another and . . . must be removed, at some cost, in order to prevent the danger from materializing.' [Citations.] [¶] . . . [¶] [T]he damages allegedly suffered by the building owners from the presence of [asbestos materials] cannot be considered solely economic losses. . . . The fact that the measure of damages is economic does not preclude a physical injury." (*Id*. at pp. 91–93.) Similarly, in *Shade Foods*, *supra*, 78 Cal.App.4th 847, a roaster supplied roasted diced almonds which contained wooden splinters. The almonds were processed into nut clusters that were incorporated into breakfast cereal. *Shade Foods* held that the splinters in the almonds caused property damage to the "nut clusters" and to the cereal in which they were incorporated. (*Id*. at p. 868.)

However, *Armstrong*, *supra*, 45 Cal.App.4th 1 noted the difference between the case before it (involving hazardous materials) and cases involving defective construction: "The insurers rely upon the rule that physical incorporation of a defective product into another does not constitute property damage unless there is physical harm to the whole. [Citations.] In our view, however, that rule is designed to limit the liability coverage of contractors against claims of defective materials or poor workmanship, for such claims are a commercial risk which is not passed on to the liability insurer. [Citations.] Here, . . . [t]he claims against Armstrong go beyond allegations of defective work or materials and allege injury to other property." (*Id*. at pp. 92–93.) This view is consistent

15

with the holding of numerous other cases that defective construction is not covered under a CGL policy unless there is damage to *other* property. (See *ibid*.)

Here, however, *Armstrong* and *Shade* are inapposite because they involved contamination by hazardous materials that were incorporated into a whole, and did not involve the incorporation of defective workmanship in to a construction project. California cases consistently hold that coverage does not exist where the only property "damage" is the defective construction, and damage to *other* property has not occurred. Under that thesis, there is no coverage for Regional's use of defective tie hooks. Indeed, Regional's attempts to bring the allegedly cracking concrete floors within the definition of "other" property in order to obtain coverage fail because JSM made no allegations that Regional's installation of the tie hooks, rather than Webcor's pouring of the concrete, was the cause of out-of-level floors. The only allegations JSM made against Regional are that it failed to install the proper tie hooks, and its failure to do so necessitated demolition and repair of the affected areas—allegations squarely within the ambit of the rule of *F&H Construction* that this type of repair work is not covered under a CGL policy. Further, in its cross-complaint, Webcor nowhere alleged indemnity against Regional based upon out-of-level floors; rather, its allegations were conclusory and sought indemnity based upon JSM's FACC that alleged claims for demolition, repair, and lost use based on the faulty tie hooks. For the same reason Regional's attempts to bring the defective work within the "loss of use" provisions of the Policy fails: any loss of use was occasioned by the necessity of repairing Regional's defective tie hooks, a risk not covered by the CGL policy. Finally, any recitals in the settlement agreement between JSM, Webcor, Babayan and Regional in the underlying litigation that characterize the construction defects as including the out-of-level floors cannot transform JSM's construction defect claim against Regional into property damage for purposes of the Policy where there is no evidence that Liberty was aware of the settlement and concurred in this characterization.

16

### C. Policy Exclusions

Regional argues the impaired property exclusion, on its face, only applies if JSM is able to conclusively establish that (1) no other property was damaged, and that (2) that the insured's product was in fact defective. Liberty responds that neither the pleadings nor evidence support Regional's contention that JSM alleged a claim to property other than Regional's own work, and the deposition excerpts do not trigger a duty to defend.

"[I]nsurers often limit coverage in exclusions despite broad general coverage provisions." (*Westoil Terminals Co., Inc. v. Industrial Indemnity Co.* (2003) 110 Cal.App.4th 139, 149.) The insurer "has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected." (*Continental Cas. Co. v. Phoenix Constr. Co*. (1956) 46 Cal.2d 423, 432.) The insured has the burden of proving his or her claim is within the basic scope of coverage, while the insurer has the burden of proving exclusions to coverage. (*Golden Eagle Ins. Corp. v. Cen-Fed., Ltd.* (2007) 148 Cal.App.4th 976, 984.) Provisions that limit coverage reasonably expected by an insured must be "'conspicuous, plain, and clear.'" (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204.) Although we normally interpret insuring clauses broadly and strictly construe exclusions, "'where an exclusion is clear and unambiguous, it is given its literal effect.'" (*Westoil Terminals Co.*, at p. 146.)

The Policy excludes "'[p]roperty damage' to 'your product' arising out of it or any part of it" and also provides, "[d]amage to Impaired Property or Property not Physically Injured," excludes "'[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of: [¶] (1) [a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work.'" The policies define "[y]our product" to mean "[a]ny goods or products . . . manufactured, sold, handled, distributed or disposed of" by the insured or those it controls. "'Impaired property'" means 'tangible property, other than 'your product' . . . that cannot be used or is less useful" because it "incorporates 'your product' . . . that is known or thought to be defective, deficient,

17

inadequate or dangerous  [¶] . . . [¶]  if such property can be restored to use" by the "repair, replacement, adjustment or removal of 'your product' or 'your work.'"

The "Impaired Property" exclusion bars the possibility of coverage.  Under that exclusion, there is no coverage for property damage to "property that has not been physically injured" arising out of the Regional's negligent failure to perform its contractual obligations based on installation of defective tie hooks.  JSM's action alleged that Regional negligently installed improper tie hooks and thus the underlying suit arose from deficiencies in Regional's performance of its work or from Regional's failure to perform a contract in accordance with its terms, or both.  (*Watts Industries, Inc. v. Zurich American Ins. Co.* (2004) 121 Cal.App.4th 1029, 1046–1047.)

## DISPOSITION

The judgment is affirmed.  Respondent is to recover its costs on appeal.

JOHNSON, J.

We concur:

CHANEY, Acting P. J.

MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| REGIONAL STEEL CORPORATION, | B245961 |
| | (Los Angeles County |
| Plaintiff and Appellant, | Super. Ct. No. BC464209) |
| | |
| v. | CERTIFICATION AND |
| | ORDER FOR PUBLICATION |
| LIBERTY SURPLUS INSURANCE | |
| CORPORATION, | |
| | |
| Defendant and Respondent. | |

The opinion in the above-entitled matter filed May 16, 2014, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


CHANEY, Acting P. J.          JOHNSON, J.          MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.